# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1021

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri |
| Maurice Rose, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: November 19, 2003

Filed: April 7, 2004

_____

Before LOKEN, Chief Judge, and McMILLIAN and BEAM, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

Maurice Rose appeals from a final judgment entered in the United States District Court[1] for the Eastern District of Missouri upon a jury verdict finding him guilty of one count of witness tampering and one count of possession of a firearm during a crime of violence. Rose's conviction resulted from the attempted murder of Ben White, a government witness who was scheduled to testify at the criminal trial

_____

[1]The Honorable Carol E. Jackson, Chief Judge, United States District Court for the Eastern District of Missouri.

of Qusai Mahasin, an associate of Rose. Rose was sentenced to 330 months in prison and five years of supervised release, and he was ordered to pay $200.00 in special assessments and $2,345.15 in restitution. United States v. Rose, No. 4:02CR4 (E.D. Mo. Dec. 20, 2002) (judgment). For reversal, Rose argues that (1) the district court erred in denying his motion to suppress White's identification of him in a photographic line-up and (2) the evidence presented at trial was insufficient as a matter of law to support the jury's verdict. For the reasons stated below, we affirm.

Jurisdiction was proper in the district court based upon 18 U.S.C. § 3231. Jurisdiction is proper in this court based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(b).

## Background

The following is a summary of the pertinent background facts based upon the evidence presented at Rose's trial, viewed in a light favorable to the verdict.

Facts related to the events of April 6, 2000

On April 6, 2000, in St. Louis, Missouri, White was driving home from school in a white Camaro when he encountered Mahasin,[2] an acquaintance, driving a minivan. The two talked briefly, then White parked his car and got into Mahasin's car, and together they went to get something to eat. They next proceeded to Mahasin's house, where they picked up another acquaintance, Nakia Henderson, and drove to Henderson's house. When they stopped in front of Henderson's house, a police car driven by Officer Demetrius Hatley of the University City (Missouri) Police Department pulled up behind them with its dashboard lights flashing. Officer

---

[2]The name "Mahasin" herein refers to Qusai Mahasin. Relatives of Qusai Mahasin who have the same last name are identified by their full names.

Hatley had intended to issue a citation for a traffic violation. As Officer Hatley approached the minivan, he could see in the rear view mirror the face of the driver, whom he recognized as Mahasin. He also observed White exiting from the passenger side of the minivan and instructed White to get back into the car. White got back into the vehicle, and it sped away. Hatley pursued the minivan in his patrol car. When they were near the intersection of Sadler Avenue and Crest Avenue, Officer Hatley observed White jump out of the minivan, throw a bag and an object appearing to be a gun into a fenced yard, and then run off. Meanwhile, the minivan sped away. In the interests of safety and preservation of evidence, Officer Hatley retrieved the two items. One was a plastic bag containing 529 grams of heroin in several smaller bags, and the other was a handgun in working condition with the serial number defaced. The minivan was later found abandoned and was impounded by the police. It was claimed by Mahasin's mother, Zakiyyah Mahasin, who provided proof of ownership.

White was apprehended and arrested shortly thereafter. He was taken to the University City Police Department, where he refused to make a statement. The next day, April 7, 2000, White provided federal agents with the following handwritten statement.

> I left school around 12:45 and ran into Q He had asked me where I was headed I said no where right now. so he said I might as well ride with him to get something to eat so I got in the car and went to Jack in a box. After getting something to eat he went home. And picked up a this girl and on the way of dropping her off we was pulling up to her house I step out of the car. I told him that he was getting pulled over and he told me to run and tried to hand me the bag. I said what, he said run, I said what, he said get in the car. When I got in he pulled off very fast. And told me several times to get out in run with the bag. so he hit a corner and said get out now. I was in shock that he had gave me the bag and throw the bag out as I fell out the car and the gun fell out to from under the sit. so I saw the gun in the street and through it. I was running home and the police got me.

Government Trial Exhibit 8.

White was charged by criminal complaint in federal court with possession of heroin with the intent to distribute. However, this criminal complaint against White was later dismissed. After his arrest on April 6, 2000, White no longer associated with Mahasin.

On December 19, 2001, White testified before a federal grand jury regarding the events of April 6, 2000. His testimony was consistent with the handwritten statement he had provided to federal agents on April 7, 2000.

On January 2, 2002, the grand jury indicted Mahasin on charges of possession with intent to distribute more than 100 grams of heroin and possession of a firearm in furtherance of a drug trafficking crime. Mahasin was arrested on March 15, 2002, and arraigned on March 22, 2002. On March 25, 2002, the government provided Mahasin's attorney discovery materials which included the handwritten statement White had provided federal agents on April 7, 2000.

Facts related to the events of April 18, 2002

In the early afternoon of April 18, 2002, White was at his family's home at 1465 Partridge in University City, preparing to take his dog to the veterinarian. He first moved his brother's car, which was parked across the street, to the same side of the street as his house. While doing so, he observed a man whom he did not recognize down the street in front of the home of Brenda "B.J." Royston. Brenda Royston was the girlfriend of Mahasin's uncle, Salidin Mahasin, and White had previously seen Salidin Mahasin around Royston's home. After parking his brother's car near the front of his house, White went to his back yard to retrieve his dog. White then observed the same man behind a bush near the front of his house. He waited for

the man to walk past his house and then exited his back yard with his dog. As White proceeded down his driveway, the man turned back and approached him. The man – later identified as Rose – began chatting with White about the dog and playing with the dog. White asked Rose if he lived nearby, and Rose indicated that he had a girlfriend who lived nearby. White indicated that he had to go. Rose asked "What's your name, man?" and White replied "Ben." Rose then turned to his right and turned back, pointing a gun directly at White. White dropped the car keys and turned to run away, with his arms covering his head. He was shot several times in the arms and back and fell to the ground unconscious. White regained consciousness and managed to get back to his porch, where he collapsed. White's father and brother rushed out of the house and found him on the porch. His brother called 911. Shortly thereafter, paramedics arrived, and White was taken to the hospital by ambulance. White underwent surgery twice on April 18, 2002, and a third time on April 22, 2002.

At the time of the shooting, nothing of value had been demanded or taken from White. The dog had run away and was later returned home. An individual named Brad Troutman had been doing yard work at a friend's house at 1516 Partridge at the time of the shooting. Troutman heard the gunshots and, moments thereafter, observed a gray minivan speeding away. He reported his observations to the police.

Detective Daniel Brady of the University City Police Department began investigating the shooting shortly after the police received the 911 call placed by White's brother. Detective Brady learned that White was a witness in Mahasin's case and that Mahasin's uncle, Salidin Mahasin, occasionally stayed with Brenda Royston and her two daughters at 1511 Partridge. Detective Brady went to the Royston home, where he found and interviewed one of Brenda Royston's daughters, Brittany. Brittany provided a description of a gray van which Detective Brady suspected was connected to the shooting.

Detective Brady also received information that Salidin Mahasin had moved into the residence at 4938 St. Louis Avenue, the home of Zakiyyah Mahasin. Detective Brady went to 4938 St. Louis Avenue, where he found Salidin Mahasin but was unable to obtain additional information from him.

Detective Brady also obtained the description of the shooter which White had given to police officers immediately after the shooting. White had described the shooter as a thin, dark-complected young black man, possibly with acne, approximately 5'8" tall, and wearing a gray shirt and a black "do-rag."

On April 19, 2002, Detective Brady obtained from the St. Louis Police Department names of, and information about, three known associates of Mahasin. Detective Brady also obtained a color photograph of each of the three individuals. Among them was Rose, also known as "Rese" or "Reece Brown." Rose's address of record was 4938 St. Louis Avenue. In one of the photographs of a Mahasin associate (not Rose), the individual was wearing eyeglasses. Detective Brady then selected three more color photographs of individuals who were unrelated to the case but fit the description black male, age 18-25, dark complexion. Detective Brady created a photographic line-up which uniformly displayed all six photographs without any identifying marks. Rose's picture was in position number three.

On April 20, 2002, Detective Brady visited White at the hospital, with the hospital's permission. Both of White's parents were present in his hospital room when Detective Brady arrived. Detective Brady showed White the photographic line-up and asked White if he could identify any of the six individuals as the shooter. Detective Brady cautioned White that he was not obligated to make an identification and that the shooter was not necessarily among the individuals represented. White promptly and positively identified Rose's photograph as the shooter. Because White was unable to write due to his injuries, his father initialed Rose's picture. Detective

Brady contacted the St. Louis area police dispatcher and had Rose's name posted as "wanted."

On April 21, 2002, three days after the shooting of White, Mahasin was visited at the St. Genevieve County jail by Rose and two females, one of whom was Mahasin's girlfriend, Valerie Booker. The jail required all visitors to sign in. Rose signed in under the name Maurice Rose and provided the address 4938 St. Louis Avenue. After the three visitors left, the deputy on duty alerted the St. Genevieve dispatcher that Rose had not presented a valid driver's license at the time he signed in. Shortly thereafter, Rose was pulled over and cited for driving without a valid license. At the time, he was driving a gray minivan registered to Zakiyyah Mahasin, with Missouri license plate number 057NLY.

On April 23, 2002, Detective Brady obtained records provided by the St. Genevieve County jail regarding individuals who had visited Mahasin. Based upon that information, Detective Brady went to the home of Valerie Booker, at 7103 Lexington. When he arrived at that location, Detective Brady observed a gray minivan parked in the driveway. Detective Brady took several photographs of the gray minivan and showed the photographs to Brad Troutman. Troutman positively identified the vehicle as the one he had seen speeding away on the day of the shooting. The gray minivan in Booker's driveway had Missouri license plate number 057NLY.

On April 23, 2002, Mahasin was brought to federal court for a status conference in his criminal case related to the events of April 6, 2000. Mahasin was accompanied by Deputy United States Marshal Pat Schulze. During the status conference, Rose and a young black female sat in the courtroom. Rose was wearing a do-rag, and Shulze asked Rose to remove it. Schulze was aware of the outstanding "wanted" posting for Maurice Rose. Right after the status conference ended, Schulze repeatedly asked Mahasin for the name of the man sitting in the courtroom (referring

to Rose), but Mahasin would not answer. She then approached Rose outside the courtroom, asked him for some identification, and – upon his production of a driver's license bearing his name – she placed him under arrest.

Procedural background

Rose and Mahasin were charged as co-defendants in a four-count superseding indictment. Counts I and II of the superseding indictment, arising out of the events of April 6, 2000, charged only Mahasin with possession with intent to distribute more than 100 grams of heroin and possession of a firearm in furtherance of a drug trafficking crime. Counts III and IV, arising out of the events of April 18, 2002, charged both Rose and Mahasin with attempting to kill a person with the intent to prevent testimony in an official proceeding and possession of a firearm in furtherance of a crime of violence. Rose's and Mahasin's cases were severed for trial.

Prior to his trial, Rose moved to suppress White's identification of him on the ground that the photographic line-up shown to White by Detective Brady on April 20, 2002, was unduly suggestive. The matter was initially submitted to a magistrate judge, who recommended that Rose's suppression motion be denied. Over Rose's objections, the district court adopted the magistrate judge's report and denied the motion.

At Rose's trial, the government's witnesses included Officer Hatley, Ben White, Brad Troutman, Detective Brady, and others. During the government's case-in-chief, the jury heard recordings of several telephone calls placed by Mahasin from the St. Genevieve County jail prior to the shooting of White. While the jury listened to these recordings, they were allowed to follow along using typewritten transcripts

-8-

provided by the government.[3]  In one of the recorded telephone conversations, Mahasin told Booker: "Rese.  Ain't no good.  I'm going to have to reprogram White myself."  Government Trial Exhibit 31 (quoted in Brief for Appellee at 19).  In another of those telephone conversations, which took place on April 2, 2002, Mahasin spoke directly with Rose.  The following is an excerpt from the government's transcript of that telephone conversation.

Rese [Rose]: Hello?

Unidentified voiced in the background: Hey shorty.

Q [Qusai Mahasin]: Hey hello.

Rese: What's up Ri?

Q:     Hey what's up man?  What's up with that?

Rese: Man you know man.  Sal got into it with BJ last night.  They stole his money and they kicked him out and all that but I'm still on my job you hear me?

Q:     What that ain't even done yet huh?

Rese: Naw.  I gotta I gotta I been on that.  Oh I don't even know the dog lookin now.  The dog wasn't there.  I just found out how the dog looks.

Q:     Man that's fucked up.

Rese: Alright.  Man this nigger man.

---

[3]The jury was instructed by the district court that the transcripts were not evidence and that the recordings themselves were the primary evidence of their own content.  Trial Transcript, Vol. II, at 292.

Q:      Man hey just fuck it man.  Don't even, uh just fuck it man.

Rese:  Fuck it Ri?

Q:      Yeah.  Fuck it.  Let me speak to Valerie.

Government Trial Exhibit 32A at 5-6 (set forth in Appellee's Appendix at 5-6).

During a recorded telephone conversation between Mahasin and an individual named Ron Riggins, on April 3, 2002, Mahasin repeatedly mentions that he is scheduled to go to court on the eleventh, that there is one witness in his case, and that he is looking at forty years.  At one point Mahasin states: "I'm finna to have to go to trial man he can't handle no business man," to which Riggins responds: "I mean Rese talking to me like he everything good," and Mahasin then replies: "Naw."  Later in the same conversation, Mahasin states: "But unless some motherfucker walk him through it, he just all fucked up."  Riggins responds: "Right, right, right, right.  I'm gonna go there if I catch him, you know what I'm saying, I'm I'm walk him through it just how you say."  To that, Mahasin replies: "Yep cuz if it don't if it don't, you know you know cuz once I go to the eleventh that's that pretrial. . . . I'll be fucked." Government Trial Exhibit 33A at 6-14 (set forth in Appellee's Appendix at 18-26).

In the same telephone call on April 3, 2002, an individual identified as "Gas" gets on the phone and has the following conversation with Mahasin:

G ["Gas"]: You know Rese got the dog?

Q:      Huh?  I know but he ain't doin nothin he ain' doin it.

G:      He ain't putting it down?

Q:      Nope.

G:     He supposed to put it down right?

Q:     Yeah he ridin around getting high and stuff.

         . . . .

G:     So check it out check it out, I'm gonna say it like this.  The red one or the white Camaro?

Q:     Huh?

G:     The red IROC or the white IROC?[4]

Q:     Oh you know you know who um testifying against me huh?

G:     The red IROC?

Q:     The Ben

G:     Or the white?  The red one?

Q:     Naw the white.

G:     Oh yeah?

Q:     Yeah.  Yeah they got that one his name you know Ben, the one Ben?

G:     Uh huh.

Q:     Yeah the he the one that's finna point me out.  He got caught with twenty-six ounces.

_____

[4]The car that Ben White was driving on April 6, 2000, before he got into Mahasin's minivan, was a white Camaro RS, which looks just like a Camaro IROC from the outside.  See Trial Transcript, Vol. I, at 59, 143.

Id. at 19-20 (set forth in Appellee's Appendix at 31-32).

After Gas finishes talking with Mahasin, Riggins gets back on the telephone and says, among other things: "Hey that's it man. . . . That's for you. . . . Alright you owe me one." Mahasin responds: "Man I owe you more than one. I owe you five." Id. at 23-24 (set forth in Appellee's Appendix at 35-36).

The jury found Rose guilty on both counts against him. Rose was sentenced to 330 months in prison and five years supervised release. He was ordered to pay $200.00 in special assessments and $2,345.15 in restitution. This appeal followed.

## Discussion

### Motion to suppress White's identification

Rose argues that the district court erred in denying his motion to suppress White's identification of him. He contends that the photographic line-up Detective Brady showed to White in the hospital on April 20, 2002, was impermissibly suggestive and that, under the totality of the circumstances, the suggestive procedures employed by Detective Brady sufficiently created a likelihood of misidentification to warrant a reversal on due process grounds. See United States v. Johnson, 56 F.3d 947, 953 (8th Cir. 1995) ("To test the reliability of identification procedures, . . . [f]irst, we consider whether the identification procedures were impermissibly suggestive. Second, if the procedures were impermissibly suggestive, we look to the totality of the circumstances to determine whether the suggestive procedures created a very substantial likelihood of irreparable misidentification.") (internal quotation marks and citations omitted).

Rose argues that the procedures used by Detective Brady were clearly and consciously designed to lead White to identify an associate of Mahasin as the shooter.

-12-

Detective Brady told members of White's family that he believed the shooting was related to Mahasin's criminal case and then showed White the photographic line-up displaying six young African-American males, three of whom were known to be closely associated with Mahasin. Nakia Henderson testified that she had seen White and Rose interacting with one another at Mahasin's house. Therefore, Rose suggests, White may have selected Rose in the photographic line-up because of his ties to Mahasin. Rose also argues that his photograph was suggestively distinct from the others because he was the only one shown with his eyes closed and very short hair. Moreover, one of the other two Mahasin associates was shown wearing eyeglasses, even though White had never mentioned eyeglasses in his description of the shooter. Rose also argues that the evidence indicates that White paid no particular attention to the appearance of the shooter at the time the shooting occurred. Once the gun was drawn, Rose explains, White was frightened and shocked and was either turned away from the shooter or unconscious. White's description of the shooter, Rose adds, lacked specificity and could apply to many people in the St. Louis area. In sum, Rose argues, White's identification of him was so unreliable under the totality of the circumstances that the admission of any evidence related to the identification violated his right to due process.

We review the district court's denial of Rose's motion to suppress *de novo*. See United States v. Johnson, 56 F.3d at 953 (motion to suppress involves question of federal constitutional law and is subject to *de novo* review). We first consider whether the photographic line-up was unduly suggestive. Rose's picture was one among six photographs shown to White. Each photograph in the line-up was presented in the same manner, without any marks or identifying information showing. While Rose's eyes may have appeared closed in his photograph and his hair shorter than the rest, the basic physical features of each of the others were consistent with the description provided by White and generally similar to Rose's own features. We cannot conclude that the photographic line-up was itself unduly or impermissibly suggestive. See id. at 953-54 (photographic line-up was not impermissibly suggestive

-13-

where the witnesses were shown two photographic spreads, the appellant's photograph was the only one appearing in both spreads, and all of the individuals shown were African-American men with features similar to the appellant's); cf. Ruff v. Wyrick, 709 F.2d 1219, 1220 (8th Cir. 1983) (presentation of single photograph was impermissibly suggestive). As to Rose's suggestion that White merely selected him because White recognized him as a friend of Mahasin, we note that – despite Nakia Henderson's testimony – White testified that he had never seen Rose before April 18, 2002, and that he had stopped "hanging around" Mahasin after April 6, 2000. Trial Transcript, Vol. I, at 81, 142-43.

Moreover, White's identification of Rose in the present case was reliable under the totality of the circumstances in light of, for example, his opportunity to observe the shooter before the shooting occurred, the detail and accuracy of his description of the shooter, the level of certainty he demonstrated at the time he identified Rose, and the lapse of time between the shooting and the confrontation. See id. (citing Manson v. Brathwaite, 432 U.S. 98 (1977) (stating relevant factors)). White had a good opportunity to observe the shooter because the individual approached him in broad daylight and they had a face-to-face conversation without anything obstructing White's view. White described the shooter with a fair degree of detail. White's description accurately fit Rose. White viewed the photographic line-up only two days after the shooting. White was coherent and alert at the time of his initial identification, and he appeared sure of himself in identifying Rose in the photographic line-up. In sum, we conclude that the photographic line-up was not impermissibly suggestive nor was White's identification of Rose unreliable under the totality of circumstances. Accordingly, we hold that the district court did not err in denying Rose's motion to suppress.

Sufficiency of the evidence

Rose further argues that the evidence presented at trial was insufficient as a matter of law to support the jury's verdict. In order to establish Rose's guilt on the witness tampering count under 18 U.S.C. § 1512(a)(1)(A), the government was required to prove beyond a reasonable doubt (1) that Rose knowingly attempted to kill White and (2) that he did so with the intent to prevent White's attendance or testimony at an official proceeding. Rose focuses his argument on the second element of the offense. The government's theory was that Mahasin had ordered or asked Rose to shoot White to prevent White from testifying against him. Rose contends that the only evidence to support this theory consisted of the recorded telephone conversations between Mahasin and others while Mahasin was being held in the St. Genevieve County jail prior to the shooting. However, Rose maintains, he participated in only one of those telephone conversations, and, in that conversation, Mahasin ultimately told him to "forget about it."[5] Brief for Appellant at 23. Rose

---

[5]Rose is referring to the following:

Q[usai]:    Man hey just fuck it man. Don't even, uh just fuck it man.

Rese:       Fuck it Ri?

Q[usai]:    Yeah. Fuck it. Let me speak to Valerie.

Government Trial Exhibit 32A at 5-6 (set forth in Appellee's Appendix at 5-6).

On cross-examination of government witness Joseph Nickerson, Rose's counsel elicited the following testimony regarding the above-quoted exchange between Rose and Mahasin:

Q[uestion]: And at the very end of page six, Mr. Rose is told by Qusai, "Just forgot [sic] all about it." He says it in more graphic terms. But he said, "Don't even" - -

suggests that a full and fair reading of the transcripts as a whole reasonably establishes only that Mahasin was concerned with raising money to post a bond for his release. In addition, Rose argues, the government's assumption that Mahasin wanted White silenced is "fatally flawed." Id. at 24. Rose notes that White had already testified at great length regarding the events of April 6, 2000. Moreover, he argues, White's story was full of false, misleading, and suspicious statements and omissions. For example, Rose points out, White omitted the name of Nakia Henderson in the handwritten statement he gave to federal agents on April 7, 2000, even though he knew her. White must have known that, if his statement were truthful, Nakia Henderson would have been able to corroborate it. However, if he were lying, she would have contradicted him. Therefore, Rose argues, Mahasin more likely wanted White to be present at his trial so that his counsel could discredit White on cross-examination and show that White, not Mahasin, was the one responsible for the drugs and the gun on April 6, 2000. Rose also discounts the significance of the relatively short time frame between when the United States Attorney's office turned over White's written statement to Mahasin's attorney, March 25, 2002, and the attempted murder of White on April 18, 2002. Rose points out that Mahasin would have known that White was a potential witness against him long before White's written statement was formally disclosed to him. Rose also argues that, even assuming Mahasin was guilty of possessing the drugs and gun on April 6, 2000, killing White would not have solved his legal problems because Nakia Henderson, who was with Mahasin and White on April 6, 2000, also could have testified against him. In sum, Rose argues, no reasonable jury could find beyond a reasonable doubt that he shot White with the intent to prevent White from testifying in Mahasin's criminal case.

_____

A[nswer]: Yes, sir.

Trial Transcript, Vol. II, at 302-03.

-16-

In evaluating the sufficiency of the evidence to support the jury's guilty verdict, we view the evidence in the light most favorable to the government, resolving all evidentiary conflicts in the government's favor and accepting all reasonable inferences that support the verdict. If the evidence so viewed can reasonably be interpreted as establishing the defendant's guilt beyond a reasonable doubt, we must uphold the verdict. See, e.g., United States v. Collins, 340 F.3d 672, 678 (8th Cir. 2003); United States v. McCarthy, 244 F.3d 998, 999-1000 (8th Cir. 2001). Rose was charged with two offenses: witness tampering and use of a firearm during a crime of violence. The jury's findings on the first element of the witness tampering count (i.e., attempt to kill another), as well as the firearm offense, were supported by overwhelming evidence. The evidence showed that the shooter, upon confirming White's identity, fired multiple gunshots directly at White from close range. The description of the shooter given by White immediately after the shooting matched Rose's characteristics. Two days after the shooting, White positively identified Rose in a photographic line-up. A minivan driven by Rose three days after the shooting was positively identified by a witness as the vehicle the witness observed speeding away from the area of the shooting just moments after the shooting occurred.

As to the second element of the witness tampering count (i.e., that Rose intended to prevent White's attendance or testimony at an official proceeding), Mahasin's telephone conversations prior to the shooting of White clearly establish that Mahasin knew he was facing a sentence of up to forty years and knew that White was the key witness against him. Mahasin states to Valerie Booker that he will "have to reprogram White [him]self" because "Rese ain't no good." Rose then tells Mahasin: "I'm still on my job," and "I just found out how the dog looks." The next day, Mahasin says to Riggins: "I'm finna to have to go to trial man he can't handle no business man." He suggests that someone needs to "walk him through it," and Riggins responds by assuring Mahasin: "I'm gonna go there if I catch him, you know what I'm saying, I'm I'm walk him through it just how you say." Finally, when Mahasin talks with "Gas" during the same telephone call, he makes it clear that he is

referring to "Ben," the one who is going to "point [him] out." Given the totality of the circumstances, a reasonable interpretation of these telephone conversations is that Mahasin had directed Rose to kill White in order to keep White from testifying against him. It was reasonable for the jury to find beyond a reasonable doubt that Rose shot White with the intent to prevent White from testifying against Mahasin. We hold that there was legally sufficient evidence at trial to support the jury's verdict.

## Conclusion

The judgment of the district court is affirmed.

_____