# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 07-1439

———————

United States of America,    *
                             *
Plaintiff - Appellee,        *
                             *    Appeal from the United States
v.                           *    District Court for the
                             *    Western District of Missouri
Steve L. Wright, Jr.,        *
                             *
Defendant - Appellant.       *

———————

Submitted: January 15, 2008
Filed: August 4, 2008

———————

Before LOKEN, Chief Judge, MURPHY, Circuit Judge, and JARVEY,[*] District
Judge.

———————

LOKEN, Chief Judge.

After an eleven-day trial, a federal jury convicted Steve L. Wright of fourteen
counts of conspiracy to distribute cocaine base, ecstacy, marijuana, PCP, and
Diazepam; possession, attempted possession, and aiding and abetting the possession
with intent to distribute cocaine base, cocaine, ecstasy, marijuana, PCP, and
methamphetamine; use of a firearm in relation to drug trafficking crimes resulting in
two deaths; aiding and abetting the possession of firearms in furtherance of drug

———————

[*]The HONORABLE JOHN A. JARVEY, United States District Judge for the
Southern District of Iowa, sitting by designation.

trafficking crimes; and aiding and abetting the killing of a potential witness in violation of 18 U.S.C. § 1512(a)(1)(C). The district court[1] sentenced Wright to life in prison plus 110 years. On appeal, Wright's attorney argues that the district court committed a jury voir dire error related to Wright's membership in the "51st Street Crips" Kansas City street gang. In a *pro se* supplemental brief, Wright argues that his Confrontation Clause rights were violated by the admission of hearsay statements of a deceased victim, Michael Birks, and that the government failed to prove that he aided and abetted the killing of Birks with the intent to prevent Birks from communicating with law enforcement about possible federal offenses, an element of the § 1512(a)(1)(C) offense. We affirm.

## I. The Jury Voir Dire Issue

Prior to voir dire, the district court mailed prospective jurors 113 questions prepared by counsel. One question, proposed by Wright, asked:

> If an individual has been identified as a member of any group that might be called a "street gang", do you believe that this person is more likely to be prone to violence or to crime than an individual who is not a member of a "street gang"?

Of the 134 prospective jurors who responded, 106 answered yes to this question. Wright moved to strike all 106 for cause, arguing that the affirmative answer "clearly indicates a presumption of bias and prejudice against the Defendant who will be identified as a member of a street gang." The magistrate judge[2] recommended that the 106 not be struck because their answers did not establish inability to render a fair and

---

[1]The HONORABLE FERNANDO J. GAITAN, JR., Chief Judge of the United States District Court for the Western District of Missouri.

[2]The HONORABLE ROBERT E. LARSEN, United States Magistrate Judge for the Western District of Missouri.

just verdict, and recommended that the district court at voir dire inquire whether each of the 106 would be able to follow the law as instructed and render a verdict based on the law and the facts as found. Wright objected, arguing that all 106 should be struck for cause. The district court overruled this objection, advised that the court would conduct voir dire limited to follow-up questions based on the jurors' prior responses, and invited counsel to submit proposed follow-up voir dire questions.

In response, Wright requested that the court ask 43 supplemental voir dire questions, 25 of which related to street gangs, and conduct "individual and separate" voir dire of each prospective juror. Before the start of voir dire, the district court advised that follow-up questions would be limited to those recommended by the magistrate judge and invited counsel to request more or otherwise make a record after this questioning. At the start of each day of the two-day voir dire, the court asked the entire panel whether any member's judgment would be affected by the race of the defendant; none responded. The court then separated the panel into groups of six or seven and asked each potential juror who answered the street gang question affirmatively whether he or she could keep an open mind and wait until all the evidence was presented before deciding whether the government met its burden of proof. The court refused defense counsel's requests that particular panel members be asked additional questions concerning gang membership. All jurors whose answers evidenced even the slightest possible anti-gang bias were stricken for cause.

On appeal, Wright argues that the court deprived him of the right to obtain a fair and impartial jury when it refused to ask prospective jurors who answered the gang question affirmatively extensive follow-up questions regarding possible gang-related bias. Wright does not challenge the fairness of any person selected as a juror. He does not argue that any specific prospective juror was not asked particular questions. And he does not argue that he lacked information needed in exercising his peremptory challenges as to specific jurors. Compare United States v. Blom, 242 F.3d 799, 804-06 (8th Cir.), cert. denied, 534 U.S. 880 (2001).

Absent "substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case . . . . the Constitution leaves it to the trial court, and the judicial system within which that court operates, to determine the need for" voir dire questions probing possible juror bias or prejudice. Rosales-Lopez v. United States, 451 U.S. 182, 190 (1981) (plurality opinion); see Mu'Min v. Virginia, 500 U.S. 415, 422-27 (1991). In general, a district court should, if requested, ask voir dire questions designed to detect a prejudice that may be relevant to the impending trial, but the extent and nature of that inquiry is left to the court's discretion. See, e.g., United States v. Spaar, 748 F.2d 1249, 1252-54 (8th Cir. 1984). Here, the district court adopted procedures for the lengthy jury selection process that we approved in a recent capital case from this District, United States v. Ortiz, 315 F.3d 873, 888-89 (8th Cir. 2002), cert. denied, 538 U.S. 1042 (2003). By including a gang-related question in the initial questionnaire, the court honored Wright's request to inquire into that possible prejudice. No such inquiry was made in People v. Jimenez, 672 N.E.2d 914, 916-17 (Ill. App. 1996), the case on which Wright primarily relies. Moreover, at voir dire, the district court was careful to ask the kind of follow-up question that the dissenters concluded should have been asked in Gardner v. Barnett, 199 F.3d 915, 924 (7th Cir. 1999) (en banc) (Cudahy, J., dissenting), cert. denied, 529 U.S. 1079 (2000). There was no abuse of discretion.

## II. The Confrontation Clause Issue

Count Six charged Wright with aiding and abetting William Williams and Rashawn Long in shooting and wounding Anthony Conaway and Justin Hill during an attempted PCP robbery on February 1, 2001. Before Conaway testified, Wright objected that testimony relating what Michael Birks said to Conaway that evening would violate Wright's Sixth Amendment Confrontation Clause rights because Birks was murdered later that night and therefore was unavailable and had not been subject to cross examination. The district court overruled the objection, and Conaway testified that Birks told him who had participated in the shooting.

On appeal, Wright argues that this testimony violated his Confrontation Clause rights as construed in Crawford v. Washington, 541 U.S. 36 (2004). Crawford recognized a common law "forfeiture by wrongdoing" exception to the right of confrontation, id. at 62, but the exception does not apply, Wright contends, because the government failed to prove that Birks was murdered for the purpose of preventing him from testifying.[3] However, the Confrontation Clause only bars "admission of *testimonial* statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Davis v. Washington, 547 U.S. 813, 821 (2006) (emphasis added), quoting Crawford, 541 U.S. at 53-54. Thus, the threshold Confrontation Clause issue is whether Birks's statement to Conaway was "testimonial."

The Supreme Court has not comprehensively defined "testimonial" statements. In Davis, it held that statements made in a 911 call "to describe current circumstances requiring police assistance" are not testimonial. 547 U.S. at 827. Applying Davis, we held in United States v. Johnson, 495 F.3d 951, 976 (8th Cir. 2007), that remarks about murders made by one inmate to another "fall safely outside the scope of testimonial hearsay." And in Giles, the Court recently observed in dicta that "[s]tatements to friends and neighbors about abuse and intimidation, and statements to physicians in the course of receiving treatment," are not testimonial. 128 S. Ct. at 2692-93. Reviewing the statements made by Birks to Conaway in the context of these decisions, we agree with the government that the statements were not testimonial. Therefore, Wright's Confrontation Clause rights were not violated.

---

[3]This argument was strengthened by the Supreme Court's recent decision in Giles v. California, 128 S. Ct. 2678, 2688-93 (2008). We note that the common law exception at issue in Giles is not necessarily co-extensive with the forfeiture-by-wrongdoing hearsay exception codified in Rule 804(b)(6) of the Federal Rule of Evidence. Wright did not raise Rule 804(b)(6) in the district court, and therefore we do not consider it. See generally United States v. Emery, 186 F.3d 921, 926-27 (8th Cir. 1999), cert. denied, 528 U.S. 1130 (2000).

### III. Sufficiency of the Evidence on Count Seven

Count Seven charged Wright with aiding and abetting Williams and Long in murdering Michael Birks to prevent him from communicating with law enforcement officials regarding possible federal offenses in violation of 18 U.S.C. § 1512(a)(1)(C). Wright argues that we must vacate his conviction and life sentence on Count Seven because the government failed to prove that the murder of Birks was committed with the requisite intent. In resolving this issue, we review the evidence in the light most favorable to the jury's verdict, giving the government the benefit of all reasonable inferences. "We must uphold the conviction unless no reasonable jury could find [Wright] guilty." United States v. Marquez, 462 F.3d 826, 828 (8th Cir. 2006) (quotation omitted).

To prove a violation of § 1512(a)(1)(C), the government need not prove that the defendant knew a federal investigation was underway, or even contemplated, or that defendant intended to prevent the victim from communicating with *federal* officials. See § 1512(e)-(g); United States v. Harris, 498 F.3d 278, 284-86 (4th Cir. 2007), cert. denied, 128 S. Ct. 1703 (2008). But there must be proof "that at least some part of a defendant's motive in killing that victim" was to prevent communication with law enforcement officials in the investigation of a possible federal crime. Emery, 186 F.3d at 925. The district court instructed, without objection, that the government must prove either Wright, "or others whom he was then aiding and abetting," murdered Birks with this intent.

Government witness Marlin Brown testified that he met with Wright, Williams, Long, and Birks on the evening of January 31, 2001. Birks urged the group to rob and kill competing drug dealer Conaway, who Birks believed was carrying $10,000 and nine ounces of PCP. Birks arranged a drug buy with Conaway, and the five drove to the meeting place. After waiting twenty minutes, Wright and Long left in a separate vehicle. When Conaway arrived in a car driven by Hill, Birks walked to the vehicle

and handed Conaway money for vials of PCP. Williams pulled his car alongside Conaway's and began firing, seriously wounding Conaway and Hill before driving away with Brown. Birks ran from Conaway's vehicle to avoid gunfire from Conaway but told Williams and Brown to leave him at the scene.

After riding with Williams to a friend's house, Brown called Birks on his cell phone. Birks said he had driven Conaway to the hospital and was waiting for Wright and Long to pick him up. Some time later, Wright, Long, and Birks arrived. Birks went upstairs to change his clothes, which were covered with Conaway's blood. Long told Williams to kill Birks because he told Conaway that Williams was the shooter. Birks came downstairs and suggested they attempt to recover Conaway's money and PCP. When that effort failed, the five drove Birks to where he had hidden money and marijuana a few hours earlier. When Birks left to retrieve the items, Long told Williams to shoot Birks. Birks returned, and Williams opened fire. Wounded, Birks begged for his life. Long executed Birks at close range with a handgun Wright gave him earlier in the evening. Long robbed Birks's body, and the four left.

Brown testified that Long told Williams to kill Birks because Birks had told Conaway that Williams shot him. Therefore, Wright argues, the evidence only established that Birks was killed because Williams feared retaliation by Conaway, a rival gang member and drug dealer, not to prevent communication with law enforcement officials. But the evidence viewed in the light most favorable to the jury's verdict points in another direction. Williams, at Long's urging, initially shot Birks, but it was Long who executed the wounded Birks as he pleaded for his life. Conaway testified that Birks identified the four assailants -- Wright, Long, Williams, and Brown -- but never said who did the shooting. Long and Wright then drove Birks to where Brown and Williams were waiting. The jury could have inferred that, during this drive, Birks told Wright and Long what he had disclosed to Conaway. Killing Birks would not protect the group from revenge by Conaway, but it would eliminate Birks, a now-proven "snitch," who was eyewitness to the drug theft and shooting of

-7-

Conaway, crimes that were later charged as Counts Five and Six of this federal indictment. The statute does not require proof that a federal investigation was underway at the time of the killing, only that Long and/or Wright believed that Birks was a potential witness against them. See United States v. Davis, 357 F.3d 726, 728 (8th Cir. 2004), vacated on other grounds, 543 U.S. 1099 (2005).

There was additional circumstantial evidence that Wright and his associates killed Birks to prevent communication with law enforcement officials concerning federal offenses. After the killing, Marlin Brown sensed danger, ran from the others, and hid until daylight. Five days later, he told the police about the killing. One month after that, Brown saw Long for the first time since the killing at a nightclub. When Brown and his friends got in their car to leave, Long approached and began shooting with an assault rifle. Hit three times, Brown is now paralyzed from the waist down. In addition, Wright was arrested numerous times for gun, drug, and driving offenses in the thirteen months prior to the shooting of Birks. John Roberts, also a member of the 51st Street Crips, testified that in March 2000 he saw Wright fire into a parked vehicle from the passenger side of the car in which Wright was riding. Wright later told Roberts that he shot at the driver of the other vehicle, a drug dealer named Gerald, because he was a "snitch." Gerald Johnson later testified that he had been cooperating with the police at the time of the shooting, and "[p]eople in the streets knew."

Viewing this evidence in its entirety, it was reasonable for the jury to find that Wright and/or Long and Williams murdered Birks to prevent his communication with law enforcement officials about the shooting of Conaway and Hill, or about the gang members' other on-going federal drug and firearm offenses. See United States v. Rose, 362 F.3d 1059, 1067-68 (8th Cir. 2004).

The judgment of the district court is affirmed.

_____