2009 ND 147

STATE of North Dakota, Plaintiff
and Appellee

v.

Tamara SORENSON, Defendant
and Appellant.

State of North Dakota, Plaintiff
and Appellee

v.

Aron Wesley Nichols, Defendant
and Appellant.

Nos. 20080132, 20080134.

Supreme Court of North Dakota.

July 21, 2009.

Kathleen Kay Trosen (argued), State's Attorney, Fessenden, N.D., and Jonathan R. Byers (appeared), Assistant Attorney General, Office of Attorney General, Bismarck, N.D., for plaintiff and appellee.

David Neil Ogren, Grand Forks Public Defender Office, Grand Forks, N.D., for defendant and appellant Tamara Sorenson.

Robert Wade Martin, North Dakota Public Defenders' Office, Minot, N.D., for defendant and appellant Aron Wesley Nichols.

CROTHERS, Justice.

[¶ 1] Aron Nichols appeals from a district court judgment entered after a jury found him guilty of two counts of murder for the April 6, 2007 deaths of Donald and Alice Willey. Tamara Sorenson appeals from a district court judgment entered after jury found her guilty of two counts of accomplice to the murders. We affirm both judgments, concluding Nichols' confrontation rights were not violated, the district court did not erroneously deny Nichols' requested jury instruction, the court did not err in denying Nichols' motion to suppress evidence, Sorenson's due process rights were not violated and sufficient evidence exists to support Sorenson's convictions.

I

[¶ 2] In 1999, Sorenson and Andrew Willey had a child together. Andrew Willey died in an accident in 2002, and Sorenson later began dating Nichols. Andrew Willey's death resulted in a settlement of over $2 million, which was placed in a trust for the child. Donald Willey and Sorenson were two of the trust's four trustees.

[¶ 3] After Andrew Willey's death, Sorenson allowed his parents, Donald and Alice Willey, to have visitation with the child. In 2006, Sorenson tried to stop the visitation, but the Willeys filed a petition for visitation with the court, and the court entered a judgment granting visitation. Nichols told several people he was upset with the Willeys and wanted to kill them. After the Willeys had visitation with the child in March 2007, Sorenson accused the Willeys of sexually abusing the child. On March 21, 2007, the child was admitted to Prairie St. John's, a psychiatric and chemical dependency center because Sorenson thought the child was depressed and had behavioral issues stemming from alleged sexual abuse by the Willeys. The child was discharged on April 6, 2007.

[¶ 4] The Willeys spoke with the child by phone at 6:53 p.m. on April 6, 2007. Sorenson and Nichols also talked to each other by phone throughout that evening. At 7:11 p.m., after the child's phone call

with the Willeys, Sorenson called Nichols' cell phone and spoke to him until around 8:30 p.m. Nichols called Sorenson at 8:34 p.m., and they talked for 21 minutes. The calls from Nichols' cell phone were transmitted through a Carrington cellular phone tower not far from the Willeys' residence near Sykeston in rural Wells County. On the evening of April 6, 2007, the Willeys were shot and killed with a .45 caliber gun in their home, and the house was set on fire. Evidence indicated that the fire was burning by 11:30 p.m. and that the Willeys were dead before the fire began. Evidence showed the fire was started in the basement and the fire burned the entire residence. Nichols called Sorenson from his cell phone at 11:41 p.m., and the call was again transmitted through the Carrington cellular phone tower. Nichols had purchased a .45 caliber handgun in February 2007, and purchased ammunition for the gun on April 6, 2007. Nichols' .45 caliber handgun was not recovered, and Nichols told law enforcement officers he sold it shortly after the Willeys were killed because Sorenson told him to.

[¶ 5] On April 13, 2007, a law enforcement officer accompanied a sanitation worker while trash was collected from a residence Nichols and Sorenson shared in Fargo. The trash was collected on the normal garbage day, and the garbage bags were placed near the curb in front of the house next to a mailbox, which was close enough to the street that the postal worker could reach the box from the street. The law enforcement officer did not obtain a warrant before collecting the trash. Items collected from the trash, including a container for .45 caliber ammunition, a note about the Willeys and mail addressed to Nichols and Sorenson, were used to secure a search warrant for the residence.

[¶ 6] On April 18, 2007, law enforcement officers searched the Nichols–Sorenson residence and found a notebook on the kitchen table containing firefighter training notes including information about how fire behaves, a jacket with heat damage and a computer printout of a newspaper article about the fire at the Willey residence. The officers also found mason jars containing moth balls and a liquid substance that appeared to be gasoline, .45 caliber shell casings, and ammunition and loaded guns in the master bedroom.

[¶ 7] During an April 19, 2007 search of Nichols' vehicle, law enforcement officers found a hand drawn diagram of the Willey residence, with directions to the residence on the back. Nichols had never been inside the Willey residence before April 6. A handwriting expert testified it was "highly likely" Sorenson wrote the labels on the diagram of the Willey's house.

[¶ 8] On April 19, 2007, law enforcement officers searched Sorenson's father's property with his consent. Nichols and Sorenson had been shooting a .45 caliber weapon on the property on April 7, 2007. Bullets found during the search matched bullets removed from the Willeys' bodies and were fired from the same weapon. Sorenson's father testified no other .45 caliber weapon had been fired on his property. Shell casings found in the Willey residence were consistent with shell casings found on Sorenson's father's property and with shell casings found at the Nichols–Sorenson residence.

[¶ 9] In April 2007, Nichols was charged with two class AA felony murders for the Willeys' deaths. In June 2007, Sorenson was charged with two counts of accomplice to murder for allegedly aiding Nichols in the murders.

[¶ 10] After Sorenson was charged, Nichols wrote a letter, in which he admitted he shot Alice and Donald Willey and started the fire at the Willey residence. The letter also stated that Sorenson was

not involved in the murders and that Nichols did not want her punished for a crime she did not commit. Nichols wrote other letters stating that he would sacrifice himself for Sorenson.

[¶ 11] In September 2007, Nichols moved to suppress evidence from the search of the trash from his residence. Nichols argued his Fourth Amendment right to be free from unreasonable searches and seizures was violated because law enforcement officers did not have a warrant to search the trash, the trash was within the curtilage of his home and he had a reasonable expectation of privacy. After an evidentiary hearing, the district court denied Nichols' motion to suppress, finding Nichols did not have a reasonable expectation of privacy in the trash and the officers did not need a search warrant because the trash was set out on the berm for pickup.

[¶ 12] In February 2008, Rolland Rust, a polygraph examiner, conducted a polygraph examination of Sorenson. The State did not have notice of the examination and was not present during the examination. Sorenson gave notice of her intent to call Rust as an expert witness, and on February 28, 2008, Sorenson filed a motion in limine to admit expert evidence about polygraph testing and the polygraph results at trial. At a February 29, 2008 hearing, the court considered whether an evidentiary hearing was necessary for the polygraph issue. The parties submitted briefs and other supporting materials on the issue. The court heard further arguments on the issue at a March 12, 2008 hearing and took the issue under advisement. During the trial, the court denied Sorenson's motion to admit the polygraph results and expert testimony.

[¶ 13] As part of the State's response to a discovery request, phone calls recorded while Sorenson and Nichols were in jail were disclosed, including calls between Sorenson and Nichols and between Sorenson and other family members. In February 2008, Nichols filed a motion in limine to exclude evidence of the calls, arguing they violated his Sixth Amendment confrontation rights because the calls were testimonial hearsay statements that were not subject to cross-examination. The court denied his motion concluding his confrontation rights were not violated and the statements were admissible. The telephone recordings and transcripts of the recordings were admitted at trial.

[¶ 14] A jury trial was held in March 2008. Nichols presented evidence including testimony from a clinical psychologist, that he was acting under the influence of extreme emotional distress at the time of the murders. The psychologist testified that Nichols has a serious mental disorder and is paranoid, but that he knew what he was doing and was criminally responsible. The psychologist also testified to Nichols' belief that the Willeys abused Sorenson's child and that that may have set him off. The State also called a psychologist, who agreed that Nichols was mentally ill but was criminally responsible for his conduct. The State's psychologist also testified that Nichols' main motive for the murder was his belief the Willeys abused the child, that the act was premeditated and that Nichols acted purposefully, with the intent to do the acts and with the requisite state of mind for the alleged offenses. Nichols requested a jury instruction making extreme emotional disturbance an element of the crime and placing the burden of proof on the State. The court refused to give the requested instruction. The court instructed the jury that it must first determine Nichols' guilt for the murders and, if the jury found Nichols guilty, that it was required to find whether Nichols acted under the influence of extreme emotional

disturbance for which there was a reasonable excuse. The jury found Nichols guilty of both counts of murder and that he did not act under the influence of an extreme emotional disturbance. The jury also found Sorenson guilty of both counts of accomplice to murder.

## II

[¶ 15] Nichols argues the district court erred in admitting hearsay statements because those statements were not subjected to cross-examination and violated his Sixth Amendment confrontation rights. Nichols contends the recorded phone conversations between Sorenson and him and those between Sorenson and other family members are testimonial statements and may be admitted into evidence only if the declarant is unavailable and a prior opportunity for cross-examination existed.

[¶ 16] This Court applies a de novo standard of review when reviewing an alleged violation of a constitutional right. *State v. Blue,* 2006 ND 134, ¶ 6, 717 N.W.2d 558. The Confrontation Clause of the U.S. Const. amend. VI, states that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." In *Crawford v. Washington,* 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held the Sixth Amendment prohibits the admission of testimonial hearsay against the accused, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the declarant. The Confrontation Clause does not apply to non-testimonial hearsay. *Id.* See also *Davis v. Washington,* 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (only testimonial statements cause the declarant to be a "witness" within the meaning of the Sixth Amendment). The Supreme Court did not define what a testimonial statement is, but

said there are three "formulations" of the "core class of 'testimonial statements:' "

> "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Crawford,* at 51–52, 124 S.Ct. 1354 (internal quotation marks and citations omitted).

[¶ 17] Although the Court did not define what a testimonial statement is, it said, "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* at 51, 124 S.Ct. 1354. At a minimum, testimonial statements include prior testimony at a preliminary hearing, testimony before a grand jury, testimony at a former trial and police interrogations. *Id.* at 68, 124 S.Ct. 1354. Most of the statements covered by one of the hearsay exceptions, such as business records or statements in furtherance of a conspiracy, are not testimonial. *Id.* at 56, 124 S.Ct. 1354. Non-testimonial hearsay is subject to traditional limitations on hearsay and not the Confrontation Clause. *Davis,* at 821, 126 S.Ct. 2266.

[¶ 18] Nichols claims the recorded phone conversations are "undoubtedly" testimonial statements because they are "statements obtained from verbal or written comments made by each of the respec-

tive Defendants." However, he cites no authority to support his claim.

[¶ 19] Other courts considering similar arguments have held that out-of-court statements by an individual to a friend, family member or cellmate are non-testimonial statements. *See United States v. Wright,* 536 F.3d 819, 823 (8th Cir.2008) (deceased victim's statement to witness was non-testimonial); *United States v. Jordan,* 509 F.3d 191, 201 (4th Cir.2007) (alleged co-conspirator's statements to friend are not testimonial); *United States v. Lee,* 374 F.3d 637, 645 (8th Cir.2004) (co-defendant's statements to his mother were not testimonial); *State v. Hughes,* 286 Kan. 1010, 191 P.3d 268, 276 (2008) (co-defendant's confession to cellmates were not testimonial); *State v. Ransom,* 207 P.3d 208, 220 (Kan.2009) (out-of-court statement by alleged accomplice that the police had the wrong lead, made while defendant and accomplices were watching a news story about the crime, was not testimonial); *State v. Chio Hang Saechao,* 195 Or.App. 581, 98 P.3d 1144, 1146 (2004) (co-defendant's statements during phone call from jail to a third party were not testimonial).

[¶ 20] Sorenson's statements to Nichols and other family members are not testimonial. Sorenson was not being interrogated, she was not making a formal statement, she was not being questioned by a government officer, and the statements were not made with the expectation that they would be used in the prosecution. The circumstances surrounding the statements do not raise the same concerns as statements made during a prior trial or a police interrogation. The statements are casual remarks made to an acquaintance rather than a formal statement to a government officer. We conclude the statements are not testimonial, and therefore the admission of the statements without a

prior opportunity for cross-examination did not violate Nichols' confrontation rights.

III

[¶ 21] Nichols requested the district court give a jury instruction that the non-existence of "extreme emotional disturbance" is an element of the offense of murder and that the State had the burden of proving beyond a reasonable doubt that Nichols was not suffering from extreme emotional disturbance at the time of the murders. Nichols contends the district court's decision to refuse to give his requested jury instruction was erroneous. Nichols claims extreme emotional disturbance is a defense and, therefore, the State has the burden to prove its non-existence.

[¶ 22] "We review jury instructions to determine whether, as a whole, they fairly and adequately advised the jury of the applicable law." *State v. Haugen,* 2007 ND 195, ¶ 6, 742 N.W.2d 796. An error in a jury instruction is grounds for reversal when the "instruction, read as a whole, is erroneous, relates to a subject central to the case, and affects the substantial rights of the defendant." *Id.*

[¶ 23] Under N.D.C.C. § 12.1–16–01(1), an individual is guilty of murder, a class AA felony, if the individual:

"a. Intentionally or knowingly causes the death of another human being;

b. Causes the death of another human being under circumstances manifesting extreme indifference to the value of human life; or

. . . .

Subdivisions a and b are inapplicable in the circumstances covered by subsection 2."

Under N.D.C.C. § 12.1–16–01(2), a class AA murder may be reduced to a class A murder if:

"the person causes the death of another human being under circumstances which would be class AA felony murder, except that the person causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse. The reasonableness of the excuse must be determined from the viewpoint of a person in that person's situation under the circumstances as that person believes them to be. An extreme emotional disturbance is excusable, within the meaning of this subsection only, if it is occasioned by substantial provocation, or a serious event, or situation for which the offender was not culpably responsible."

[¶ 24] Nichols claims evidence of extreme emotional disturbance was introduced, entitling him to a jury instruction on the issue. The instructions given to the jury included the essential elements of the crime of murder, definitions of certain terms and a verdict form requiring the jury to find whether Nichols was guilty of murdering the Willeys. The court used a special verdict form which required the jury to consider extreme emotional disturbance if it found Nichols was guilty of murder. After finding Nichols guilty of murder, the instruction on extreme emotional disturbance required the jury to evaluate the reasonableness of any emotional disturbance:

"The reasonableness of the excuse must be determined from the viewpoint of a person in that person's situation under circumstances as that person believes them to be. And extreme emotional disturbance is excusable if it is occasioned by substantial provocation, a serious event, or a situation for which the offender was not culpably responsible."

The instruction did not advise the jury whether the State or Nichols had the burden of proof and what quantum of proof was required. Although the district court did give a jury instruction on extreme emotional disturbance, Nichols contends the instruction did not properly advise the jury of the law because it did not advise the jury that extreme emotional disturbance is an element of the crime and that the State had the burden to prove the nonexistence of extreme emotional disturbance beyond a reasonable doubt.

[¶ 25] An individual may not be convicted of an offense unless the State proves each element of the offense beyond a reasonable doubt. N.D.C.C. § 12.1–01–03(1). An element of an offense is:

"a. The forbidden conduct;

b. The attendant circumstances specified in the definition and grading of the offense;

c. The required culpability;

d. Any required result; and

e. The nonexistence of a defense as to which there is evidence in the case sufficient to give rise to a reasonable doubt on the issue."

N.D.C.C. § 12.1–01–03(1).

[¶ 26] A similar argument about extreme emotional disturbance was made in *State v. Dilger*, 338 N.W.2d 87 (N.D.1983). The defendant claimed the "lack of extreme emotional disturbance became an element of the crime of murder that the State had to prove beyond a reasonable doubt." *Id.* at 94. This Court said extreme emotional disturbance would be an element of the crime and the State would have the burden of proving the non-existence of extreme emotional disturbance beyond a reasonable doubt if it constituted a "defense" to the charge of murder. *Id.* at 95. We held extreme emotional disturbance is not an element of the crime be-

cause the statute does not explicitly designate it as a defense, and therefore it is a mitigating circumstance. *Id.* The same arguments were raised in *State v. Frey,* 441 N.W.2d 668, 672 (N.D.1989), and we held *Dilger* still applied and declined to reconsider the issue.

[¶ 27] Nichols contends *Dilger* no longer applies after *State v. Olander,* 1998 ND 50, 575 N.W.2d 658. In *Olander,* at ¶ 7, the defendant argued nonexistence of self-defense was an essential element of murder, manslaughter, or negligent homicide and the State had the burden of proving beyond a reasonable doubt that he was not acting in self-defense. We said the nonexistence of a defense is an element of an offense if there is sufficient evidence to give rise to a reasonable doubt on the issue. *Olander,* at ¶ 20 (citing N.D.C.C. § 12.1–01–03(1)(e)). However, we also said an "affirmative defense" is not an element of the crime and must be proven by the defendant by a preponderance of the evidence. *Olander,* at ¶ 20. Because our statutes designate self-defense as a "defense" and not an "affirmative defense," it is an element of the crime and "if there is evidence to support a self-defense claim, [a defendant] is entitled to [a jury] instruction on [the issue] and the State must prove beyond a reasonable doubt the [defendant] did not act in self-defense." *Id.*

[¶ 28] *Olander* applied to claims of self-defense and not claims of extreme emotional disturbance. The extreme emotional disturbance provision has not been amended to explicitly designate it as either a defense or an affirmative defense under the statute, and it is not included in N.D.C.C. ch. 12.1–05, which contains defenses and affirmative defenses. Therefore, *Olander* is consistent with *Dilger.* Unlike self-defense, which is explicitly designated as a defense, in *Dilger* we said

extreme emotional disturbance was not explicitly listed as a statutory defense. 338 N.W.2d at 95. As a result, it was not an element of the crime and the State did not have the burden of proof. *Id.* We conclude the rationale of *Dilger* still applies, extreme emotional disturbance is not a defense to the crime of murder and the State is not required to prove the nonexistence of an extreme emotional disturbance beyond a reasonable doubt.

[¶ 29] In *Dilger* this Court said neither party has the burden of proof because the legislature did not provide a specific burden of proof. 338 N.W.2d at 95. However, "'the prosecution can be expected to endeavor to prove the elements of the highest offense; it will attempt to disprove the mitigating circumstance. Because only the defendant will gain by establishing the mitigating circumstance, he alone will be concerned with showing its existence.'" *Id.* (quoting *State v. Muscatello,* 55 Ohio St.2d 201, 378 N.E.2d 738, 740 (1978)). The district court did not err in refusing to instruct on the burden of proof.

[¶ 30] We conclude the jury instructions as a whole adequately and correctly informed the jury of the law.

### IV

[¶ 31] Nichols argues the district court erred in determining the warrantless search of his trash was not a violation of his Fourth Amendment right against unreasonable searches and seizures. Nichols claims the trash was located within the curtilage of the residence and he had a reasonable expectation of privacy in the trash.

[¶ 32] The Fourth Amendment of the United States Constitution and North Dakota Constitution art. I, § 8, protect an individual's right to be free from unreasonable searches and seizures. A warrantless

trash search violates an individual's Fourth Amendment rights if there "is a subjective expectation of privacy [in the trash] that society accepts as objectively reasonable." *State v. Schmalz,* 2008 ND 27, ¶ 22, 744 N.W.2d 734 (quoting *State v. Rydberg,* 519 N.W.2d 306, 309 (N.D.1994)). Although the North Dakota Constitution may provide greater protection against unreasonable searches and seizures, it is not implicated unless a reasonable expectation of privacy has been invaded. *Schmalz,* at ¶ 22.

[¶ 33] When individuals place their trash out for collection with the purpose of abandoning it to the trash collector they have:

> "exposed their garbage to the public sufficiently to defeat their claim to Fourth Amendment protection. It is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public. Moreover, respondents placed their refuse at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through respondents' trash or permitted others, such as the police, to do so. Accordingly, having deposited their garbage 'in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it,' respondents could have had no reasonable expectation of privacy in the inculpatory items that they discarded."

*Schmalz,* 2008 ND 27, ¶ 22, 744 N.W.2d 734 (quoting *Rydberg,* at 309–10).

[¶ 34] This Court has held warrantless trash searches did not violate an individual's Fourth Amendment rights. *See, e.g., Schmalz,* at ¶¶ 22–26 (individual did not have a reasonable expectation of privacy in

trash placed on sidewalk in front of home for disposal); *State v. Jones,* 2002 ND 193, ¶ 16, 653 N.W.2d 668 (no reasonable expectation of privacy in trash in a trash receptacle in alley clearly set out for disposal); *State v. Carriere,* 545 N.W.2d 773, 775–76 (N.D.1996) (no reasonable expectation of privacy in trash when the owner placed the trash on his property at the end of the driveway in a container).

[¶ 35] Although Nichols claims the trash was located within the curtilage of his residence and there was not a sidewalk to separate the berm or boulevard area from the yard, the district court found the trash was placed on the berm or the boulevard area in front of Nichols' house and was set out for trash collection. The court found the trash bags were left in an area near the mailbox next to the street, in a location where a postal worker could drive up to the mailbox and take the mail from the street. The court found Nichols did not have a reasonable expectation of privacy and concluded his Fourth Amendment rights were not violated. Testimony from the law enforcement officer who collected the trash established the trash was placed next to the street on the berm next to the mailbox for normal collection. The evidence supports the court's findings.

[¶ 36] The trash was placed in front of the residence next to the street in trash bags for normal trash collection, with the purpose of abandoning it to the trash collector. Nichols did not have a reasonable expectation of privacy in the trash. The trash was lawfully searched, and the evidence was lawfully seized. We conclude the district court did not err in denying Nichols' motion to suppress.

V

[¶ 37] Sorenson argues her due process rights were violated when the dis-

trict court allowed the State's polygraph expert to testify at a hearing without giving her polygraph expert the same opportunity. Sorenson claims the court allowed a one-sided evidentiary hearing by not giving Sorenson the opportunity to present evidence supporting her argument.

[¶ 38] "A person is denied due process when defects in the procedure employed might lead to a denial of justice." *State v. Ehli*, 2003 ND 133, ¶ 10, 667 N.W.2d 635. Notice and an opportunity to be heard are fundamental requirements of due process. *Id.*

[¶ 39] On February 13, 2008, Rust completed a polygraph examination of Sorenson. The State was not informed of the polygraph before it was conducted and was not present during the examination. During a February 22, 2008 pretrial conference, Sorenson gave notice that she intended to call Rust as an expert witness and the State moved to prohibit the introduction of any evidence relating to the polygraph test. The court asked the parties to brief and argue the issue at a hearing.

[¶ 40] On February 29, 2008, the State filed a brief supporting its motion and Sorenson moved to admit the polygraph results and opinion testimony from Rust and Charles R. Honts, another polygraph examiner. Various attachments were filed with Sorenson's brief in support of her motion, including information about Rust's work history and his resume, a copy of a district court order from a civil case admitting polygraph results and opinion testimony, and Honts' thirty-four page affidavit containing information about his work history and information about polygraph testing and its validity.

[¶ 41] During a February 29, 2008 hearing, the court asked the parties if they wanted to add to the written materials and Sorenson's attorney said he would be willing to have Rust and Honts testify about the issue. On March 10, 2008, the State filed a brief in response to Sorenson's motion to admit polygraph evidence, which included a journal article and a book supporting its argument. On March 12, 2008, Sorenson filed a brief in reply to the State's response, including a thirty-eight page affidavit from Honts, his curriculum vitae and journal articles written by Honts.

[¶ 42] The court heard arguments about the issue during a March 12, 2008 hearing and stated an evidentiary hearing was not necessary because the parties had already submitted sufficient information to rule on the issue. The court said it would allow the parties to supplement the record, but Sorenson's experts were not present during the hearing. The court asked Sorenson's attorney what additional information her expert could provide, and the attorney conceded the expert would not add any new information. The State's expert witness was allowed to testify at the hearing. The State had not filed an affidavit from its expert. Sorenson's attorney requested an evidentiary hearing, and the State argued Sorenson had an opportunity to present evidence at the hearing or to schedule an evidentiary hearing. The court said it would take Sorenson's request for a hearing under advisement.

[¶ 43] On March 26, 2008, during the trial, the court denied Sorenson's motion to admit the results of the polygraph examination and expert testimony. The court said it had reviewed the case law and had concluded the issue would become a battle of the experts because experts in the field disagree on whether polygraph results should be admitted in criminal cases. The court also said the use of polygraphs invade the province of the jury. Sorenson did not renew her request to

have her experts testify at an evidentiary hearing.

[¶ 44] The district court has discretion in deciding whether to allow testimony during a motion hearing. *See* N.D.R.Ct. 3.2(b) ("the court may require oral argument and may allow or require testimony on a motion."); *State v. Krous*, 2004 ND 136, ¶¶ 10–11, 681 N.W.2d 822. In this case, the court allowed the parties' witnesses to testify at the March 12, 2008 hearing. However, Sorenson's witnesses were not present at the hearing. Sorenson submitted lengthy affidavits from one of her expert witnesses, journal articles supporting her arguments, and she admitted her witnesses would not have new information to add. Sorenson had an opportunity to present evidence supporting her arguments during the hearing, and we conclude her due process rights were not violated.

## VI

[¶ 45] Sorenson argues the evidence is insufficient to support her convictions for accomplice to murder. She claims that many of the witnesses who testified at trial provided evidence about only Nichols and that she was convicted on innuendo.

[¶ 46] Our standard of review for appeals challenging the sufficiency of the evidence is well established:

> "we look only to the evidence and reasonable inferences most favorable to the verdict to ascertain if there is substantial evidence to warrant the conviction. A conviction rests upon insufficient evidence only when, after reviewing the evidence in the light most favorable to the prosecution and giving the prosecution the benefit of all inferences reasonably to be drawn in its favor, no rational fact finder could find the defendant guilty beyond a reason-

able doubt. In considering a sufficiency of the evidence claim, we do not weigh conflicting evidence, or judge the credibility of witnesses. A verdict based on circumstantial evidence carries the same presumption of correctness as other verdicts. A conviction may be justified on circumstantial evidence alone if the circumstantial evidence has such probative force as to enable the trier of fact to find the defendant guilty beyond a reasonable doubt. Moreover, a jury may find a defendant guilty even though evidence exists which, if believed, could lead to a not guilty verdict."

*State v. Noorlun*, 2005 ND 189, ¶ 20, 705 N.W.2d 819 (citations omitted).

[¶ 47] Sorenson was charged with two counts of accomplice to murder under N.D.C.C. § 12.1–03–01(1)(b). An individual is an accomplice and may be convicted of an offense based on the conduct of another when, "[w]ith intent that an offense be committed, he commands, induces, procures, or aids the other to commit it, or, having a statutory duty to prevent its commission, he fails to make proper effort to do so." N.D.C.C. § 12.1–03–01(1)(b).

[¶ 48] The State argued Sorenson wanted control of the trust fund and of who had visitation with her child. The State claimed that Nichols was willing to sacrifice himself for Sorenson and that Sorenson induced Nichols to act by accusing the Willeys of harming the child. The State argued Sorenson aided Nichols by drawing a diagram of the Willey's home, talking to him on the cell phone before and after the murders, and telling Nichols to get rid of the gun after the murders.

[¶ 49] Evidence established that a trust fund worth over $2 million was set up after Andrew Willey's death for Sorenson and

Andrew Willey's child and that Donald Willey was named one of four trustees. There was evidence Sorenson believed the interest from the trust fund went to the Willey family. Evidence of tension between Sorenson and the Willeys existed because of a visitation dispute. Sorenson accused the Willeys of sexually abusing the child. Testimony revealed Nichols was upset by Sorenson's allegations that the Willeys were harming the child and that Nichols wanted to kill the Willeys.

[¶ 50] Evidence disclosed Sorenson aided Nichols with the diagram of the Willeys' house. Nichols did not know where the Willeys lived before the murders. There was testimony Sorenson admitted that news reports that she had a diagram of the Willeys' house were true. A handwriting expert testified it was highly likely the writing on the diagram was Sorenson's handwriting and was not Nichols' handwriting. A notebook containing firefighter training information, including information on how fire behaves, was found at the Nichols–Sorenson residence. Testimony revealed Sorenson had received firefighter training, including information on how to burn a house by starting a fire in the basement. Evidence established Sorenson talked to Nichols on his cell phone during the hours before the murder and shortly after the fire started at the Willey's residence. Evidence showed that Sorenson told Nichols shortly after the murders to get rid of his .45 caliber handgun. Sorenson wrote a note on the day of Nichols' preliminary hearing stating the State did not have the "murder weapon," and commenting that there was no testimony at the hearing about whether law enforcement had the murder weapon.

[¶ 51] Evidence showed Sorenson induced Nichols before the murders with accusations the Willeys were abusing the child and with the motives of visitation and the trust fund. After reviewing the evidence and all inferences reasonably drawn from the evidence in a light most favorable to the verdict, we conclude evidence exists establishing Sorenson aided Nichols in committing the murders with the intent that the murders be committed. We conclude sufficient evidence exists to sustain Sorenson's convictions.

VII

[¶ 52] We conclude Nichols' confrontation rights were not violated, the jury instructions adequately advised the jury of the law and the district court did not err in denying Nichols' motion to suppress. We also conclude Sorenson's due process rights were not violated and sufficient evidence existed to support Sorenson's convictions. We affirm the district court's judgments.

[¶ 53] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, CAROL RONNING KAPSNER, and DALE V. SANDSTROM, JJ., concur.