# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-2150

_____

United States of America,

*Plaintiff - Appellee,*

v.

Stoney End of Horn,

*Defendant - Appellant.*

_____

No. 15-2151

_____

United States of America,

*Plaintiff - Appellee,*

v.

Stoney End of Horn,

*Defendant - Appellant.*

_____

Appeals from United States District Court
for the District of South Dakota - Aberdeen

_____

Submitted: February 12, 2016
Filed: July 15, 2016

_____

Before SMITH and COLLOTON, Circuit Judges, and GRITZNER,[1] District Judge.
_____

COLLOTON, Circuit Judge.

Stoney End of Horn was convicted by a jury on four counts of sexual abuse of a minor and one count of assault resulting in serious bodily injury, all occurring in Indian country. The district court[2] sentenced End of Horn to concurrent sentences of 293 months' imprisonment for each count of sexual abuse and another concurrent sentence of 120 months' imprisonment for the assault. End of Horn appeals his convictions and sentences. We affirm.

I.

The evidence on the assault charge, which we recount in the light most favorable to the verdict, concerned an incident that occurred early in the morning on September 27, 2008. The night before, End of Horn was out drinking with his girlfriend, Pauline Brave Crow, in Mobridge, South Dakota, and he agreed to give his cousin (Robert End of Horn) and two of Robert's friends (Quinton Fernandez and Elizabeth Mellette) a ride to Wakpala in Brave Crow's car.

During the drive, End of Horn and Brave Crow got into an argument. The discussion became heated, and Brave Crow attempted to jump out of the moving vehicle. End of Horn stopped the car and continued to argue with Brave Crow. End of Horn hit Brave Crow in the face with his open palm, and the two got out of the car.

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa, sitting by designation.

[2]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

As the argument carried on, Robert and Fernandez tried unsuccessfully to intervene, and the passengers eventually decided to walk to Wakpala rather than wait longer for a ride. They left Brave Crow and End of Horn at the side of the road.

Some time later, Jackie Little Dog, a childhood friend of Brave Crow, encountered Brave Crow's vehicle on the side of the road to Wakpala. Little Dog testified that when she stopped behind the parked car, she saw End of Horn hitting Brave Crow's head and face. Little Dog left because she was afraid of End of Horn. She did not report the incident to authorities, but later told one of Brave Crow's daughters what she had seen.

Later in the morning of September 27, Officer Tracy Whitaker of the National Park Service was dispatched to the residence of End of Horn's father in Wakpala in response to an assault report. There, she saw an ambulance crew treating Brave Crow for facial injuries. Whitaker asked End of Horn how Brave Crow was hurt, and End of Horn said that he and Brave Crow had been attacked by hitchhikers. Whitaker attempted to locate the site of the alleged attack, but could not find evidence of an assault by hitchhikers.

Brave Crow suffered a serious fracture, known as a LeFort III fracture, in the bones of her face. She sustained broken bones in her upper jaw and face, facial swelling and bruising on the left side of her face, and bruising under both eyes. Brave Crow was "very, very quiet" when interviewed, and she did not identify her assailant when hospitalized. Brave Crow's injuries required multiple surgeries. Her health deteriorated, and she eventually died on June 25, 2010, as a result of complications from injuries caused by the assault.

The evidence concerning sexual abuse centered on the testimony of S.N.H., a relative of Brave Crow and a twelve-year-old minor during the relevant period. S.N.H. lived with End of Horn and Brave Crow in McLaughlin, South Dakota. She

testified about an incident that occurred when Brave Crow was in the hospital for a stroke in February 2010. According to S.N.H., she woke up to discover End of Horn rubbing her vagina. End of Horn then pulled up her shirt and bra and licked her nipples before inserting his penis into her vagina.

S.N.H. also testified that End of Horn engaged in vaginal intercourse with her once a month from April through July 2010 while they were staying at the house of End of Horn's father in Wakpala. The sexual contact eventually ended. S.N.H. later reported the sexual abuse in a questionnaire that she filled out at a youth treatment facility.

A grand jury charged End of Horn with second-degree murder and assault resulting in serious bodily injury based on the attack on Brave Crow. A separate grand jury charged him with multiple counts of sexual abuse of a minor arising from his contact with S.N.H. By agreement of the parties, the cases were consolidated for trial. A jury convicted End of Horn of assault, murder, and four counts of sexual abuse. The district court, relying on *Ball v. United States*, 140 U.S. 118 (1891), and *Merrill v. United States*, 599 F.2d 240, 242 & n.4 (8th Cir. 1979) (per curiam), concluded that the second-degree murder charge required proof that Brave Crow's death occurred within a year and a day of the assault. Because the interval between assault and death was twenty-one months, the court set aside the verdict on the murder count. The court then sentenced End of Horn on the remaining counts, and he appeals.

II.

End of Horn challenges the sufficiency of the evidence to support the sexual abuse convictions. The governing statutes prescribe criminal punishment for any Indian in Indian country who "knowingly engages in a sexual act with another person" when the other person "has attained the age of 12 years but has not attained

-4-

the age of 16 years" and "is at least four years younger than the person so engaging." 18 U.S.C. §§ 1153, 2243(a). The definition of "sexual act" includes "contact between the penis and the vulva or the penis and the anus." 18 U.S.C. § 2246(2)(A).

End of Horn asserts that no reasonable jury could have convicted him because there was no physical evidence of the alleged abuse, and because S.N.H.'s willingness to be alone with him after alleged incidents of abuse conflicted with her claims. No physical evidence was necessary: "a victim's testimony alone can be sufficient to support a guilty verdict." *United States v. Seibel*, 712 F.3d 1229, 1237 (8th Cir. 2013) (internal quotation omitted); *see United States v. Kenyon*, 397 F.3d 1071, 1076 (8th Cir. 2005). S.N.H. explained her continued interaction with End of Horn after the sexual abuse as an effort to protect her younger sister from possible abuse. She testified that she did not report the abuse earlier because she did not want to make her mother unhappy. These were proper areas for cross-examination and argument by the defense, but ultimately S.N.H.'s credibility was a question for the jury. *Kenyon*, 397 F.3d at 1076; *United States v. Kirkie*, 261 F.3d 761, 768 (8th Cir. 2001). S.N.H.'s testimony was sufficient to support the convictions.

End of Horn also challenges the conviction for assault causing serious bodily injury and the concurrent sentence of 120 months' imprisonment. He argues that the district court erroneously admitted hearsay evidence from Brave Crow's former husband, Benjamin Mellette. The court, citing the residual hearsay exception of Federal Rule of Evidence 807, allowed Mellette to testify that Brave Crow told him after the roadside assault that "Stoney beat the shit out of her." Over objection, Mellette testified: "She told me that she had been drinking, her and Stoney, and she said Stoney beat the shit out of her. And then she turned around and said, 'But Ben, you know, that's my personal life.'"

Rule 807 provides that a hearsay statement is not excluded by the rule against hearsay, even if not covered by an exception in Rule 803 or 804, if the statement

(1) has "equivalent circumstantial guarantees of trustworthiness" to statements admitted under the enumerated exceptions, (2) is offered as evidence of a material fact, (3) is more probative on the point offered than any other reasonably available evidence, and (4) will best serve the general purposes of the rules of evidence and the interests of justice. We have said that this exception to the rule against hearsay "was necessary to permit courts to admit evidence in exceptional circumstances where the evidence was necessary, highly probative, and carried a guarantee of trustworthiness equivalent to or superior to that which underlies the other recognized exceptions." *United States v. Renville*, 779 F.2d 430, 439 (8th Cir. 1985). We review the district court's ruling for abuse of discretion. *United States v. Thunder Horse*, 370 F.3d 745, 747 (8th Cir. 2004).

The district court is entitled to some deference in applying Rule 807, but the court here did not address why Mellette's statement had "circumstantial guarantees of trustworthiness" equivalent to the enumerated hearsay exceptions. The government defends the ruling by pointing to other evidence at trial that supports a finding that End of Horn assaulted Brave Crow. But corroborating evidence does not provide the circumstantial guarantees of trustworthiness contemplated by the Rule. Statements admitted under the firmly rooted hearsay exceptions enumerated in Rule 803 and 804—for example, dying declarations, excited utterances, or statements made for medical treatment—are "so trustworthy that adversarial testing would add little to their reliability." *Idaho v. Wright*, 497 U.S. 805, 821 (1990), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004). According to the theory of the hearsay rule, this trustworthiness must be gleaned from circumstances that "surround the making of the statement and that render the declarant particularly worthy of belief," not by "bootstrapping on the trustworthiness of other evidence at trial." *Id.* at 819, 823 (citing 5 J. Wigmore, Evidence § 1420, at 251 (J. Chadbourn rev. 1974)); *see United States v. Tome*, 61 F.3d 1446, 1452 & n.5 (10th Cir. 1995).

To admit Mellette's testimony under the residual exception, there must be a reason why a declarant's statement to her former spouse about an assault by a new intimate partner is inherently trustworthy. When neither the government nor the district court has articulated such a theory, we are not disposed to develop one on our own. We therefore assume that the evidentiary ruling was erroneous, and we consider whether admission of the evidence affected End of Horn's substantial rights. Because statements to friends about abuse are not "testimonial" statements that implicate the Sixth Amendment right to confront witnesses against the accused, *United States v. Wright*, 536 F.3d 819, 823 (8th Cir. 2008); *see Giles v. California*, 554 U.S. 353, 376 (2008), we apply the harmless-error standard for non-constitutional errors. *See* Fed. R. Crim. P. 52(a); *Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946). A non-constitutional error is harmless if we are confident that the error did not influence the jury or had only a very slight effect on the verdict. 328 U.S. at 764. The corroborating evidence cited by the government, of course, is highly relevant to whether an evidentiary error was harmless. *See Wright*, 497 U.S. at 823.

The record as a whole, excluding the hearsay, shows a convincing case that End of Horn assaulted Brave Crow. Testimony of Robert End of Horn and Quinton Fernandez, passengers in Brave Crow's car, established that they left End of Horn and Brave Crow alone on the side of a road near Wakpala on the morning of the incident. The passengers observed a lengthy argument, inside and outside the car, during which End of Horn was visibly angry. According to Fernandez, End of Horn struck Brave Crow in the face with his open palm. These witnesses also testified that they heard screams coming from the location of the vehicle as they walked into the distance. Jackie Little Dog, a childhood friend of Brave Crow, testified that she saw End of Horn striking Brave Crow in the head and face when she encountered their car parked on the side of the road to Wakpala. The defense attacked her credibility because she failed to report the incident, but Little Dog had no apparent bias and explained that her fear of End of Horn accounted for her initial silence. Other witnesses observed

-7-

that End of Horn had abrasions on his right knuckles and swelling on his hands after the incident, thus supporting an inference that he committed the assault.

End of Horn's explanation for the injuries to Brave Crow was plagued by inconsistencies. He informed one officer that hitchhikers (three male and one female) attacked him and Brave Crow when they stopped while driving *from* Mobridge to Wakpala, but told another officer that the attack occurred when he was driving from Wakpala *toward* Mobridge. End of Horn reported to the first officer that he drove away from the attacking hitchhikers but then realized that Brave Crow was not in the vehicle and returned to the original site. Yet he told the second officer that the hitchhikers fled after he hit one of them, and that he searched for Brave Crow when he saw that she was not in the car before leaving the scene. When End of Horn spoke to a physician's assistant at the emergency room of the hospital, he reported that he and Brave Crow encountered an apparently disabled vehicle on the highway and pulled over to help, at which point two men grabbed Brave Crow and dragged her out into a field. But when speaking with Brave Crow's daughter Miranda, End of Horn claimed that he and Brave Crow stopped to pick up hitchhikers when a group of four men and a woman knocked him out, and that he could not find Brave Crow when he regained consciousness. Brave Crow declined to identify her attacker for law enforcement or for her own daughters—unlikely behavior if she had been assaulted by strangers on the roadway. End of Horn's claim that hitchhikers brutally beat Brave Crow while leaving him virtually unscathed strained credulity.

Harmless-error analysis necessarily requires a prediction about what would have occurred if the record were different. Our assessment is that the evidence of guilt was strong and that the hearsay testimony from Mellette likely did not have more than a very slight effect on the verdict. Without that testimony, a guilty verdict was still highly likely based on testimony about the heated argument that preceded the assault, the eyewitness account of Little Dog, circumstantial evidence of End of Horn's injured hands and Brave Crow's refusal to identify her attacker, and the

implausibility of End of Horn's shifting explanations for an attack by unidentified strangers. We therefore conclude that the erroneous evidentiary ruling did not affect End of Horn's substantial rights. End of Horn also challenges the sufficiency of the evidence, but the evidence discussed amply supported the verdict.

## III.

End of Horn next challenges his sentence of 293 months' imprisonment on the sexual abuse convictions. He first contends that the district court committed procedural error in calculating an advisory sentencing range when it added four levels because S.N.H. was "in the custody, care, or supervisory control" of the defendant. *See* USSG § 2A3.2(b)(1).[3] The probation office recommended this adjustment based on evidence at trial that S.N.H. lived with Brave Crow and End of Horn, and that she considered End of Horn a "father figure." At sentencing, End of Horn intentionally withdrew his objection to application of the four-level adjustment. S. Tr. 28. His claim of error is therefore waived. *United States v. Thompson*, 289 F.3d 524, 526-27 (8th Cir. 2002).

End of Horn also disputes the district court's decision to depart upward from the advisory guideline range of 151 to 188 months to a sentence of 293 months. The district court cited four separate provisions in support of its upward departure: USSG § 4A1.3 (inadequacy of criminal history category), § 5K2.1 (conduct resulting in death), § 5K2.8 (extreme conduct), and § 5K2.21 (dismissed and uncharged conduct). End of Horn challenges the court's reliance on §§ 4A1.3 and 5K2.1. We review the district court's decision to depart upward for abuse of discretion. *United States v. Shillingstad*, 632 F.3d 1031, 1037 (8th Cir. 2011).

---

[3]The presentence report mistakenly cited USSG § 2A3.1(b)(1) rather than § 2A3.2(b)(1), but the report correctly identified § 2A3.2 as the applicable guideline, PSR ¶ 24, and the reference to § 2A3.1(b)(1) apparently was a typographical error.

Section 4A1.3(a)(1) provides that a district court may depart upward when "reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." Here, the district court cited five convictions in state court for which End of Horn received no criminal history points, six convictions in tribal court that were not counted, and a larceny offense while serving in the military. Tribal offenses are a proper basis for departure, USSG § 4A1.3(a)(2)(A), and although many of the uncounted offenses in state and tribal courts were driving offenses, "even offenses which are minor and dissimilar to the instant crime may serve as evidence of the likelihood of recidivism if they evince the defendant's incorrigibility." *United States v. Agee*, 333 F.3d 864, 867 (8th Cir. 2003). The district court thus did not abuse its discretion in relying on § 4A1.3 and End of Horn's criminal history as a factor in support of its upward departure.

Section 5K2.1 authorizes a departure if death resulted from the defendant's offense conduct. The district court, addressing End of Horn's assault on Brave Crow, found that "[t]he medical evidence was conclusive that this vicious assault that the Defendant perpetrated was the cause of her death." This finding was not clearly erroneous in light of substantial evidence showing that End of Horn committed the assault, the coroner's classification of Brave Crow's death as homicide caused by blunt force trauma, and a surgeon's description of the amount of force required to cause Brave Crow's injuries. The degree of force used against Brave Crow supported an inference that the perpetrator intended to cause death or knowingly risked that result. The court thus did not abuse its discretion in relying on § 5K2.1 and Brave Crow's death as a factor supporting an upward departure.

\*     \*     \*

The judgments of the district court are affirmed.

_____

-10-