# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-3635
_____

United States of America

*Plaintiff - Appellee*

v.

Tina Sully

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota

_____

Submitted: June 14, 2024
Filed: August 19, 2024

_____

Before LOKEN, ERICKSON, and GRASZ, Circuit Judges.

_____

GRASZ, Circuit Judge.

Tina Sully, a foster parent for the Yankton Sioux Tribe, was charged with various counts of abusing her three adopted children, who resided with her on tribal

land.[1]  After her first trial resulted in a mistrial, the district court[2] scheduled her second trial to begin eighteen days after the first one ended.  Sully twice moved for a continuance, but the district court denied both motions.  During the second trial, Sully objected to the government's introduction of several out-of-court statements, which the district court admitted under Federal Rules of Evidence 803(2) and 807.  Sully appeals the denial of her motion to continue and the district court's evidentiary rulings.  We affirm.

## I. Background

On Sunday, May 23, 2021, 13-year-old C.S. ran away from home.  She trekked two miles to her neighbors' house in Wagner, South Dakota, and she hid behind a tree located at the end of their driveway.  C.S. appeared dirty, hungry, and scared.  When the neighbors—Arlis Kafka and her husband— asked if she needed help, she said yes, and they called the sheriff's office.  C.S. told the Kafkas that her adoptive mother, Sully, beat her with a belt and a coat hanger and that she had not had any food since Friday, May 21.  She showed her neighbors the marks and scars on her body.  Eventually, a deputy sheriff and social workers from the Yankton Sioux Tribe arrived, and they transported C.S. to a hospital.

An investigation into C.S.'s allegations resulted in law enforcement discovering Sully may also have, in the past, abused two of her other foster children, D.F.H. and G.S.  A grand jury indicted Sully on ten counts: two counts of assault with a dangerous weapon (Counts 1–2) and one count of felony child abuse (Count 3) as to minor victim C.S.; four counts of assault with a dangerous weapon (Counts

---

[1]The district court had original jurisdiction over the criminal charges under 18 U.S.C. § 1153, which extends jurisdiction to United States courts for certain offenses committed by an "Indian" within "Indian country."

[2]The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota.

4–7) and one count of felony child abuse (Count 8) as to then-minor victim D.F.H.; and one count of assault with a dangerous weapon (Count 9) and one count of abusive sexual contact as to then-minor victim G.S. (Count 10).

A jury trial commenced in August 2023 and ended with the district court[3] declaring a mistrial because the jury could not reach a unanimous verdict. The case was then assigned to a new judge, and the district court scheduled a second trial to begin on September 12, 2023—eighteen days after the end of the first trial. On August 31, Sully moved to continue the trial, explaining counsel's private practice case load conflicted with the proposed trial date and two defense witnesses were unavailable for those dates.

During a telephonic hearing, Sully's counsel further explained that the scheduled trial date would force her to reschedule private-practice depositions she "already rescheduled once," and that defense witnesses would be unavailable. One of the witnesses was Candy Jeanotte, one of the original social workers who worked with Sully and her family. The district court explained it had multiple trials scheduled between September and late November and, because he is "on senior status," he is "not here for trials after Thanksgiving." The only other available dates were four days during the week of September 26, 2023, but the government explained that particular week would not work because one of its experts and a victim would be unavailable to testify.

Ultimately, the district court denied Sully's motion to continue. First, it did not think conflicting depositions justified a continuance. Second, prospective witness Jeanotte lived in North Dakota, so she could not be subpoenaed to appear; because she had already missed testifying at the first trial, there was no guarantee she would appear even if the trial date was moved. The district court suggested the parties should make "best efforts to . . . secure the testimony of that witness," such

<hr />

[3]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

as by taking her deposition before trial.  Otherwise, the district court stated it would allow Jeanotte to testify at trial out of order, if necessary.  Sully's counsel was unable to secure Jeanotte's testimony.

Sully renewed her motion for continuance, with defense counsel insisting Jeanotte was a "critical witness" whose absence would be "prejudicial." Furthermore, counsel stated she "wanted to provide psychological testimony from a psychological test done of [C.S.]"  The district court denied the renewed motion, finding the set trial date was better for the child victims because testifying is "a traumatic thing for them" and Sully made "no specific showing that the defense . . . is prejudiced by going ahead with the trial at this point."

With the continuance denied, trial began on September 12.  Because Sully's evidentiary challenges only pertain to her convictions for the counts relating to C.S., we need only detail what evidence the government produced at trial as to those counts.  First, we detail the introduced evidence that Sully does not challenge on appeal.

Arlis Kafka, one of the neighbors who found C.S., testified to what C.S. told her about why she ran away.  Kafka testified C.S. appeared dirty and nervous, and she was shaking.  Without any prompting, C.S. detailed how Sully beat her with a belt and a coat hanger, withheld food from her, and made her sleep on the laundry room floor.  Kafka explained that C.S., without prompting, showed scars on her abdomen from prior beatings and a mark on her leg from where Sully had kicked her.

One of the responding social workers, Kassandra Traversie, testified C.S. was visibly scared and clearly bruised.  C.S. showed Traversie the bruise on her leg, so the social workers decided to take her to the hospital.  Traversie noted C.S., a 13-year-old girl, was wearing a pull-up diaper.  After the visit to the hospital, Traversie took C.S. back to Sully's house to retrieve her clothes and to remove her other

siblings.  Traversie testified C.S. held her hand the whole time they were in the house, and C.S. hid behind her.

Ryan Kocer, a nurse practitioner, testified to examining C.S. when she visited the emergency room.  He recalled that C.S. was frightened and she wore ill-fitting clothes and a "diaper."  C.S. reported not having anything to eat for a few days.  Kocer noticed dozens of bruises and scars—some superficial, some deep—all over her body.  One scar on her head was so deep that hair no longer grew around it; it appeared to be an injury for which C.S. did not receive medical attention.  The marks he saw were consistent with C.S.'s report of repeated physical abuse.

Dr. Nancy Free, a pediatrician, also testified to medically examining C.S. when she visited Child's Voice, a children's advocacy center that provides medical evaluations for mistreated children.  Dr. Free also noted bruises, scars, and marks all over C.S.'s body.  Several of the marks were consistent with being struck with a belt or other looped object or being pinched.  C.S. also had "terrible dental decay.  Her molars were just really starting to rot."  Finally, C.S. reported that Sully would tell her "that she didn't love [C.S.], that no one could love [C.S.]"  C.S. also told Dr. Free that Sully would threaten to kill her.  Dr. Free's overall impression was that C.S. was a victim of physical and emotional abuse, as well as medical and dental neglect.

C.S. also testified at trial.  She testified she ran away because Sully would hit her with a clothes hanger and a belt.  On more than one occasion, Sully would withhold food from C.S. for several days in a row.  C.S. testified Sully would throw small rocks at her, kick her, stomp on her, hit her with a plastic tube from a breathing machine, pinch her, pull her hair and shake her head, and choke her.  Sully made C.S. wear pull-ups because she thought C.S. "didn't need to wear underwear."  Sully would not let C.S. go to school, and she made C.S. sleep on the laundry room floor.  Sully told C.S. she hated her, nobody would ever love her, she would send her away, C.S. was worthless, and Sully would kill her if she did not stop crying.  The jury also

heard from D.F.H., who testified Sully abused him when he was a child, in ways similar to C.S.

Now, we detail the testimony Sully challenges on appeal. The government introduced hearsay testimony from four witnesses, which the district court admitted—over Sully's objections—under two separate hearsay exceptions.

Two witnesses' testimony was admitted under the excited-utterance hearsay exception. *See* Fed. R. Evid. 803(2). First, social worker Traversie testified that when she accompanied C.S. to Sully's house, C.S. pointed toward a door in the hallway and told Traversie "that's where they kept her sometimes." C.S. also pointed to a black belt hanging on the wall in the laundry room and told Traversie "they hit her with that sometimes." Second, Charles Mix County sheriff's deputy Janet Budavich, who was dispatched to the Kafka house the evening of May 23, 2021, testified that C.S. told her she had not eaten in five days, she had to sleep on the floor, and Sully beat her with a belt and a clothes hanger and kicked her.

Two witnesses' testimony was admitted under the residual hearsay exception. *See* Fed. R. Evid. 807. First, Yankton Sioux Police Department criminal investigator DesaRae Gravatt, who interviewed C.S. at the hospital the evening of May 23, 2021, testified that C.S. told her how she received the injuries. The district court also allowed Gravatt's bodycam footage of the interview, in which C.S. detailed more of the abuse she suffered, to be admitted into evidence. Second, Child's Voice child forensic interviewer Amanda Liebl, who interviewed C.S. before Dr. Free examined her, testified that C.S. said Sully beat her with objects, stomped on her, choked her, kicked her, and threatened her. A video recording of Liebl's interview was also admitted into evidence.

In the end, the jury convicted Sully of all counts. Sully moved for a new trial, arguing, in part, the denial of her motions to continue warranted such relief. The

district court rejected that as a basis for a new trial, and Sully appeals that determination.[4]

## II. Discussion

We first address Sully's contention the denial of her motion to continue was an abuse of discretion entitling her to a new trial before addressing her hearsay objections.

### A. Motion to Continue

"We review a denial of a motion for continuance for abuse of discretion." *United States v. Vesey*, 330 F.3d 1070, 1071 (8th Cir. 2003). As we have explained:

> District courts are afforded broad discretion when ruling on requests for continuances. Continuances generally are not favored and should be granted only when the party requesting one has shown a compelling reason. We will reverse a district court's decision to deny a motion for a continuance only if the court abused its discretion and the moving party was prejudiced by the denial.

*United States v. Cotroneo*, 89 F.3d 510, 514 (8th Cir. 1996) (citations omitted); *accord United States v. Keepseagle*, 30 F.4th 802, 815 (8th Cir. 2022). Similarly, we review the district court's denial of a motion for a new trial for abuse of discretion. *Vesey*, 330 F.3d at 1072. "A district court may grant a defendant's motion for a new trial if the interests of justice so require." *Id.* (citing Fed. R. Crim. P. 33).

---

[4]Sully does not appeal any evidentiary issues pertaining to her convictions for abuse toward D.F.H., Counts 4 to 7. As to G.S., the district court, based on newly discovered evidence, granted Sully's post-trial motion for a retrial on Count 9 and to acquit on Count 10, and those rulings are not before us.

To warrant a new trial, Sully must also show the denial prejudiced her defense. She raises two claims of prejudice. First, she generally complains that counsel did not have "reasonable time necessary to fully reevaluate and reconsider additional case strategy before the retrial." Second, and more specifically, Sully claims the continuance would have allowed her to secure the testimony of an unspecified psychologist and of the out-of-state social worker. Neither argument is availing.

If a party asserts prejudice from the denial of a continuance, she must point to "evidence in the record indicating that the court's ruling affected [her] attorney's representation . . . ." *United States v. Keiser*, 578 F.3d 897, 902 (8th Cir. 2009). Sully cites *Vesey*, claiming her initial mistrial "is proof enough that the government's case was not airtight, making it all the more important that [the defendant] have adequate time to procure and present testimony to rebut the additional evidence . . . ." *Vesey*, 330 F.3d at 1073.

But this case is distinguishable from *Vesey*. There, the government introduced testimony from "additional witnesses regarding transactions distinct from those that were testified at the first trial." *Id.* at 1072. In moving for a new trial, Vesey provided "affidavits from three prospective defense witnesses that contradicted testimony offered by the government's witnesses . . . ." *Id.* But in this case, the government did not introduce new witnesses between the first and second trials, and Sully did not explain how her new witnesses' testimony would affect the trial's outcome. She asserts extra time would have allowed her, for example, to "seek a court order for the testimony of the psychologist that completed the psychological evaluation of C.S.," but as the district court reasoned, Sully had "lots of opportunity" to interview the psychologist in the first trial, but she chose not to.

As for Jeanotte, Sully failed to explain what Jeanotte would testify about if available. Unlike the defendant in *Vesey*, Sully did not get an affidavit from Jeanotte explaining what her testimony would be and how it would bolster Sully's defense. Even now on appeal, Sully has failed to develop how any of Jeanotte's testimony would have made a difference. Instead, Jeanotte's testimony only amounts to

cumulative, impeachment evidence against the victim, C.S. And because Jeanotte was an out-of-state witness, there was no guarantee she would attend a rescheduled trial date even if one was set.

Moreover, Jeanotte was scheduled to testify at the first trial, but Sully never called Jeanotte to testify. Sully's counsel admitted this decision was a tactical one; counsel did not want to "enflame" the jurors by making them wait four to five hours for Jeanotte's testimony. Though the "materiality of a witness" will depend on a case's specific context, *Perry v. Lockhart*, 871 F.2d 1384, 1387 (8th Cir. 1989), Sully hardly shows Jeanotte was a "material" witness to her defense. After all, Sully thought Jeanotte's testimony was not worth the risk of irritating the jurors by extending the trial. *See id.* (holding defense witnesses were not material when "their testimony either was not inconsistent with that of the State's witnesses, or, . . . , was merely a weaker repetition of the testimony of witnesses who did appear at trial").

Overall, Sully does not explain what additional arguments, evidence, or witnesses she would have discovered had the continuance been granted. She thus fails to establish the requisite prejudice to warrant a new trial. *See Cotroneo*, 89 F.3d at 514 (holding there was no prejudice when counsel claimed to require the presence of "individuals and witnesses" at a hearing but the "record contain[ed] no suggestion as to who those persons were, [or] why their testimony was necessary").

## B. Hearsay

We now turn to Sully's challenges to the admission of certain hearsay statements. We review evidentiary rulings for abuse of discretion. *United States v. Lasley*, 917 F.3d 661, 665 (8th Cir. 2019). Even if the hearsay was erroneously admitted, we will not reverse if it is harmless error; that is, "if the error did not influence or had only a very slight influence on the verdict." *Id.* at 665 (cleaned up) (quoting *United States v. Lomas*, 826 F.3d 1097, 1105 (8th Cir. 2016)).

"Hearsay—an out of court statement offered in evidence to prove the truth of the matter asserted—is generally not admissible." *United States v. Graves*, 756 F.3d 602, 604 (8th Cir. 2014) (citing Fed. R. Evid. 801, 802). Sully challenges the application of two hearsay exceptions that allowed the introduction of hearsay statements from four witnesses. First, she challenges the admission of Traversie's and Budavich's hearsay testimony, which the district court admitted under the excited utterance exception. The exception allows for the introduction of "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused," Fed. R. Evid. 803(2), the idea being that statements made while a declarant is under the "stress or shock of an event" are more trustworthy than statements made "when the declarant has the opportunity for reflection and deliberation." *Graves*, 756 F.3d at 605. In deciding whether a declarant remained "under the stress of excitement" while making a statement, we consider:

> [1] the lapse of time between the startling event and the statement, [2] whether the statement was made in response to an inquiry, [3] the age of the declarant, [4] the physical and mental condition of the declarant, [5] the characteristics of the event, and [6] the subject matter of the statement.

*Id.* (alterations in original) (quoting *United States v. Clemmons*, 461 F.3d 1057, 1061 (8th Cir. 2006)).

Looking at the record, C.S. spoke with Budavich about 45 minutes after Arlis Kafka called the sheriff's office, at which point C.S. had walked two miles from Sully's house, which also took about 45 minutes. Before Budavich arrived, C.S. was composed enough to eat a sandwich and drink some sports drink provided by Kafka. Once Budavich arrived, C.S. explained the abuse she suffered. As for Traversie, C.S. spoke with her while back at Sully's house, after C.S. had already been to the hospital and had had a medical evaluation. Because C.S. appeared nervous while she was there, the district court held the excited utterance exception applied to C.S.'s

statements, even though roughly four hours had passed since C.S. first arrived at the Kafkas' house.

Second, as to the testimony admitted under the residual exception, Gravatt and Liebl both testified to what C.S. said when they asked her questions about abuse, and the district court also admitted video recordings of their interviews. Rule 807 allows for the introduction of hearsay statements, even if the statement is not admissible under Rule 803 or 804, if:

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and
>
> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a). Rule 807(b) also requires the proponent of the statement to provide "reasonable notice" of its intent to introduce Rule 807 evidence, which the government provided to Sully.

Rule 807 concerns the possibility of evidentiary scenarios not envisioned by the other hearsay exceptions. *See United States v. Peneaux*, 432 F.3d 882, 893 (8th Cir. 2005). Rule 807:

> permits the admission of hearsay if (1) it has circumstantial guarantees of trustworthiness that are equivalent to those accompanying the enumerated hearsay exceptions; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other reasonably available evidence; and (4) its admission would best serve the purposes of these rules and the interests of justice.

*United States v. Bruguier*, 961 F.3d 1031, 1033 (8th Cir. 2020).

"Congress intended the residual hearsay exception to 'be used very rarely, and only in exceptional circumstances[.]'" *Peneaux*, 432 F.3d at 893 (quoting S. Rep. No. 93-1277, at 20 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 7051, 7066). We noted that "exceptional circumstances generally exist when a child sexual abuse victim relates the details of the abusive events to an adult." *Id.* (collecting cases). Though we have readily supported the admission of the hearsay of a child *sexual* abuse victim, whether Rule 807 readily supports the admission of the hearsay of a child *physical* abuse victim (when there is no allegation of sexual abuse) is less developed in our case law.

Here, Sully asserts C.S.'s hearsay statements lack any indication of "trustworthiness." Generally, we weigh several factors in evaluating trustworthiness, including:

> the training and experience of the interviewer; whether the child was interviewed using open-ended questions; the age of the child and whether the child used age-appropriate language in discussing the abuse; the length of time between the incident of abuse and the making of the hearsay statement; and whether the child repeated the same facts consistently to adults.

*United States v. Thunder Horse*, 370 F.3d 745, 748 (8th Cir. 2004). The district court did not give an in-depth trustworthiness explanation, concluding the statements had "sufficient guarantees of trustworthiness[.]" Rather, it stated C.S.'s hearsay was "probative on the point to which it's offered more so than any other evidence . . . . that is probably the best evidence that there is of . . . what the victim at that time reported."

Though we note Sully's arguments, we need not address whether the admission of any of the challenged hearsay statements was erroneous because assuming there was error, it was harmless. For non-constitutional errors[5] in

---

[5]Sully contends the admission of the hearsay cannot be harmless because it violated the Sixth Amendment's Confrontation Clause. But there is no

admitting hearsay testimony, an error is harmless "if we are confident that the error did not influence the jury or had only a very slight effect on the verdict." *United States v. Stoney End of Horn*, 829 F.3d 681, 686 (8th Cir. 2016).

"Harmless-error analysis necessarily requires a prediction about what would have occurred if the record were different." *Id.* at 687. Here, even if all the challenged hearsay was excluded, the record still "shows a convincing case" against Sully. *See id.* at 686. The challenged statements are cumulative of other admitted, unchallenged statements detailing C.S.'s abuse, such as the testimony from Arlis Kafka, Dr. Free, nurse practitioner Kocer, the non-hearsay testimony of Traversie, and most importantly, C.S.'s own courtroom testimony. Likewise, the jury heard testimony from D.F.H., who also testified that, similar to C.S., Sully physically abused him. "The admission of hearsay evidence that is cumulative of earlier trial testimony by the declarant or cumulative of other hearsay evidence to which no objection was made is not likely to influence the jury and is therefore harmless error." *United States v. Londondio*, 420 F.3d 777, 789 (8th Cir. 2005). This is an instance where we conclude the cumulative evidence would only have had a "slight effect" on the verdict, if any, and we will not reverse on that basis.

### III. Conclusion

We affirm the district court.

_____

_____

Confrontation Clause violation when the witness "who makes testimonial statements admitted against a defendant [is] present at trial for cross-examination . . . ." *Giles v. California*, 554 U.S. 353, 358 (2008); *see also United States v. Bordeaux*, 400 F.3d 548, 555 (8th Cir. 2005) ("The confrontation clause bars the admission at trial of the testimonial statements of a witness who is *absent from trial*[.]" (emphasis added)). C.S. testified at trial, and Sully had the opportunity to cross-examine her on any of her out-of-court statements.