# United States Court of Appeals
### For the Eighth Circuit
_____

No. 24-2134
_____

United States of America

*Plaintiff - Appellee*

v.

Wilbur Morrison, Jr.

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of South Dakota - Western
_____

Submitted: February 13, 2025
Filed: July 21, 2025
_____

Before SMITH, KELLY, and KOBES, Circuit Judges.
_____

SMITH, Circuit Judge.

A jury convicted Wilbur Morrison, Jr. of two counts of aggravated sexual abuse of a child in Indian territory, in violation of 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(A) (Counts I and II), as well as one count of assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 1153 and 113(a)(6) (Count III). The district court sentenced Morrison to 480 months' imprisonment for Counts I and II and 120 months on Count III, with all counts to run concurrently. At sentencing, the

district court orally pronounced concurrent supervised release terms of five years for Counts I and II and three years for Count III. However, the written judgment outlined concurrent supervised release terms of five years for all three counts. On appeal, Morrison argues that (1) the district court abused its discretion in admitting an excerpt of a forensic interview and accompanying testimony; (2) the evidence was insufficient to convict him on Counts I and II; (3) his sentence is substantively unreasonable; and (4) the written judgment conflicts with the oral pronouncement of the sentence and should be remanded for correction. We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

## I. *Background*

Morrison and his three children, S.M., T.M., and K.M., lived with Morrison's brother Charles, sister Elayne, and several other family members in a residence within the Pine Ridge Reservation. In January 2023, law enforcement was called to the residence after a domestic dispute between Morrison and Charles became violent. Morrison, Charles, and Elayne testified that Morrison was intoxicated. And a minor disagreement became a major fight.

Morrison's children, however, recalled the events differently. According to S.M., T.M., and K.M., Morrison was in the living room with them watching television. T.M. and K.M. were sitting on the couch, and Morrison was lying next to S.M. on the floor. T.M., who was ten years old at the time, testified that he saw Morrison "[r]aping S.M." R. Doc. 85, at 109. At trial, T.M. used an anatomical drawing to explain that he saw Morrison's "middle part" in S.M.'s buttocks. *Id.* T.M. saw S.M. laying down and Morrison behind her with his hands on her waist and the blanket moving "side to side." *Id.* at 111. T.M. saw Morrison's pants on the ground and eventually saw Morrison's penis when the blanket was lifted. K.M., who was nine years old at the time, confirmed T.M.'s account of seeing Morrison lie next to S.M. and seeing the blanket move. He testified that he was able to see Morrison put his leg over S.M. and that his pants were off and lying on the ground nearby. Counsel asked K.M. if he "remember[ed] how it was that [Morrison was] able to get his middle part into her B." R. Doc. 87, at 10. K.M. responded, "He pulled down her

pants." *Id.* T.M. testified that after Morrison passed out, he went to go tell Elayne "S.M.'s getting raped." R. Doc. 85, at 113. K.M. testified that Charles came into the living room, removed the blanket from Morrison to expose his naked body, and then said, "[g]et off your daughter." R. Doc. 87, at 16. At that point, Morrison grabbed a crowbar, and he started fighting with Charles. When the fight erupted, Elayne called law enforcement and took the children to a neighbor's house. The neighbor testified that T.M. told her that Morrison was "doing gay things to his sister." R. Doc. 85, at 97. The neighbor also testified that S.M. told her, "[S]ometimes I poop blood." *Id.*

Following the incident, law enforcement arranged two forensic interviews with S.M. conducted by Brandi Tonkel—one on January 23, 2023, and another on February 28, 2023. In the second interview, Tonkel asked S.M. if the "disgusting things" happened on "other days." R. Doc. 87, at 88. S.M. responded that it would happen on "[o]ther days too" often "at night." *Id.* at 88–89. Tonkel asked whether it "would always be [Morrison's] middle part to that part of you or would it be other places on your body?" R. Doc. 60-33, at 35:39–48. S.M. responded, "Other places." *Id.* at 35:48. When asked where Morrison's middle part would go on these other nights, S.M. pointed to the "vaginal labial area" of the diagram. R. Doc. 87, at 90.

At trial, after testifying about the events charged in Count II, S.M. was asked if she "remember[ed] the second time that [she] spoke with [Tonkel]" and "told her about the other times?" *Id.* at 48. S.M. shook her head no. Next, she was asked if she "remember[ed] telling [Tonkel] about the other times," and she shook her head again. *Id.* Then, counsel asked, "Do you just not want to talk about the other times?" *Id.* S.M. nodded her head in agreement. The government did not question her further. Later, over Morrison's objection, the government sought to introduce into evidence an excerpt from S.M.'s second forensic interview and testimony from Tonkel regarding the forensic interview under the residual exception to the hearsay rule. The court agreed that S.M. "was not able to testify about the other incident" and a portion of the interview could come in under "the residual exception." *Id.* at 85. The government presented to the jury approximately three minutes of the video and had Tonkel testify about the interview.

The government also introduced medical testimony concerning S.M. Although S.M. declined a genital examination, her physical examination revealed she had chunks of hair missing, and her blood test came back positive for an advanced stage of syphilis, indicating she had the infection for an extended period of time. The government presented expert medical testimony that syphilis is a "blood-borne pathogen," R. Doc. 86, at 30, that can be transmitted through anal, vaginal, or oral intercourse and can often be "proof of sexual abuse in children," *id.* at 34. The government also presented Morrison's medical records from a few months prior to the January incident showing that he had tested positive for syphilis and had only been partially treated.

## II. *Discussion*
### A. *Admissibility of the Forensic Interview*

Morrison argues that the district court abused its discretion by admitting the forensic interview tape and the accompanying testimony under Federal Rule of Evidence 807. We review a district court's admission of hearsay evidence for abuse of discretion. *United States v. Gallardo*, 970 F.3d 1042, 1045 (8th Cir. 2020). Evidence is admissible under the residual exception to hearsay if

> (1) it has circumstantial guarantees of trustworthiness that are equivalent to those accompanying the enumerated hearsay exceptions; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other reasonably available evidence; and (4) its admission would best serve the purposes of these rules and the interests of justice.

*United States v. Sully*, 114 F.4th 677, 685 (8th Cir. 2024) (quoting *United States v. Bruguier*, 961 F.3d 1031, 1033 (8th Cir. 2020)). When evaluating the trustworthiness of an out-of-court statement offered in lieu of a child's direct testimony regarding sexual abuse, we weigh the following factors:

> the training and experience of the interviewer; whether the child was interviewed using open-ended questions; the age of the child and

-4-

whether the child used age-appropriate language in discussing the abuse; the length of time between the incident of abuse and the making of the hearsay statement; and whether the child repeated the same facts consistently to adults.

*Id.* (quoting *United States v. Thunder Horse*, 370 F.3d 745, 748 (8th Cir. 2004)). "No single factor is dispositive; we examine the factors to determine if there are sufficient positive signs of trustworthiness." *Thunder Horse*, 370 F.3d at 748 (quoting *United States v. NB*, 59 F.3d 771, 776 (8th Cir. 1995)). On appeal, Morrison argues that the statements lacked circumstantial guarantees of trustworthiness.

We conclude that the record contains sufficient circumstantial guarantees of trustworthiness to permit admission of the hearsay in Tonkel's testimony. First, Tonkel had over 14 years of experience in interviewing child sexual abuse victims. Second, Tonkel testified that she asked open-ended questions throughout the interview. The interview excerpt confirms this testimony. Tonkel asked whether it "would it always be [Morrison's] middle part to that part of you or would it be other places on your body?" R. Doc. 60-33, at 35:39–48. This arguably leading question occurred after S.M. had already told Tonkel what happened on the specific night in January. S.M. responded, "Other places," *id.* at 35:48, and then repeatedly pointed to the vaginal labial area on an anatomically correct diagram when asked where Morrison's middle part would go on the other days. Next, S.M. was eight years old at the time, "marked anatomically correct drawings during [the] interview[,] . . . and discussed the incidents of sexual abuse in a childlike way." *United States v. Grooms*, 978 F.2d 425, 427 (8th Cir. 1992); *see also Thunder Horse*, 370 F.3d at 748 ("A declarant's young age is a factor that may substantially lessen the degree of skepticism with which our [c]ourt views her motives, and mitigates in favor of the trustworthiness and admissibility of her declarations." (internal quotation marks omitted)).

Next, S.M. spoke only to Tonkel about these other incidents. Consequently, there are no other accounts to compare for consistency. The absence of other accounts by S.M. neither strengthens nor weakens the circumstantial guarantee of

trustworthiness of her statement to Tonkel. S.M. testified that "Elayne got mad" at her for telling the neighbor about the abuse and that "[t]hey blamed it all on [her]." R. Doc. 87, at 47–48. Considering this negative response, it is not surprising that S.M. did not disclose her abuse to Elayne or other family members and was reluctant to testify about it in open court.

The absence of specific dates for the alleged abuse prevents assessment of the proximity of the incidents to the interview. Such knowledge could have affected the perception of the trustworthiness of S.M.'s statement. Nevertheless, in light of the other factors, we are satisfied that sufficient circumstantial guarantees of trustworthiness permitted the admission of the forensic interview video and the accompanying testimony. *See NB*, 59 F.3d at 777 ("Given the strength of other factors, . . . we do not think the elapsed time between . . . [the] incident[s] of abuse and her initial statement . . . outweighs the other indicia of trustworthiness in this case."). Accordingly, the district court did not abuse its discretion in admitting this evidence.

## B. *Sufficiency of the Evidence*

Next, Morrison challenges the sufficiency of the evidence for his convictions for aggravated sexual abuse of a minor involving contact between the penis and vulva (Count I) and contact between the penis and the anus (Count II).

"This court reviews the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the jury's verdict, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." *United States v. Fool Bear*, 903 F.3d 704, 708 (8th Cir. 2018) (internal quotation marks omitted). "We will overturn the verdict only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. King*, 898 F.3d 797, 808 (8th Cir. 2018).

## 1. *Count I*

Under 18 U.S.C. § 2241(c), any person who "knowingly engages in a sexual act with another person who has not attained the age of 12 years . . . or attempts to do so" is guilty of aggravated sexual abuse. The term "sexual act" includes "contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight." *Id.* § 2246(2)(A). The jury was instructed that it must find Morrison guilty of Count I if the government proved that "between August 1, 2022, and January 12, 2023, [Morrison] . . . engaged or attempted to engage in a sexual act, that is contact between the penis and the vulva, with S.M." R. Doc. 59, at 3 (bold omitted).

Morrison argues that the evidence was insufficient for Count I because there was insufficient evidence that he penetrated S.M.'s vulva. Morrison argues that his case is similar to our precedent in *United States v. Plenty Arrows*, 946 F.2d 62 (8th Cir. 1991) and *United States v. Reddest*, 512 F.3d 1067 (8th Cir. 2008). These cases are distinguishable.

In *Plenty Arrows*, we found the evidence insufficient to support a conviction for aggravated sexual abuse. 946 F.2d at 66. The victim testified that the defendant had "touched him from [the] back of [his] behind" but said no more related to the abuse. *Id.* at 65 (internal quotation marks omitted). "The government made no further effort to elicit what the victim meant by this—whether he was referring to his buttocks, anus, or to some other part of his anatomy." *Id.* Therefore, the testimony was "too vague to support the inference that contact involving penetration occurred between the penis and anus." *Id.* The court in *Plenty Arrows* contrasted its case with our precedent in *United States v. St. John*, 851 F.2d 1096 (8th Cir. 1988), in which the victim testified "that he had 'humped' with his mother and had been touched with the 'bad touch' by her," *Plenty Arrows*, 946 F.2d at 64 (quoting *St. John*, 851 F.2d at 1099), as well as "marked anatomically correct diagrams to demonstrate what had taken place," *id.* at 65 (quoting *St. John*, 851 F.2d at 1099). The court in *Plenty Arrows* found that reliance on *St. John* was "unavailing" because "the evidence in that case was much more detailed." *Id.* at 65.

In *Reddest*, we found that the evidence was insufficient to support the defendant's conviction for "penetration of the genital opening . . . by the finger . . . ." 512 F.3d at 1071 (ellipses in original) (internal quotation marks omitted). The victim testified that the defendant "touched [her] vagina" but confirmed that he only touched "the outside of [her] vagina." *Id.* at 1072 (internal quotation marks omitted). Moreover, the defendant sent a message to the victim saying he "accidentally touched [her] private part." *Id.* (internal quotation marks omitted). We found "this evidence insufficient to prove penetration of the genital opening" because "it [was] not clear where [the defendant's] finger was or how close it was to the genital opening." *Id.* (internal quotation marks omitted).

The evidence in this case, however, provides sufficient detail to distinguish it from *Plenty Arrows* and *Reddest*. It is sufficient to support the jury's verdict that Morrison penetrated S.M.'s vulva.

Unlike in *Plenty Arrows*, S.M.'s forensic interview revealed that Morrison's penis would go to a specific part of S.M.'s anatomy. *See* 946 F.2d at 65. When asked where Morrison's "middle part [would] go" on the other days, she repeatedly marked the vaginal labial area on an anatomically correct diagram. R. Doc. 60-33, at 36:13–16. This is in sharp contrast to *Plenty* Arrows, in which the testimony did not even establish whether the victim "was referring to his buttocks, anus, or some other part of his anatomy." 946 F.2d at 65. Here, the language "go," R. Doc. 60-33, at 36:15, albeit missing the word "into," is less vague and imprecise than "touched," *Plenty Arrows*, 946 F.2d at 65, when determining whether penetration occurred. Moreover, the use of an anatomically specific diagram affirmatively strengthens the child's responses because it allowed her to specifically identify the "other places," R. Doc. 60-33, at 35:38, that Morrison's "middle part [would] go," *id*. at 36:15–16; *see St. John*, 851 F.2d at 1099 (finding sufficient evidence where victim "marked anatomically correct diagrams to demonstrate what had taken place" even amidst using less descriptive language to describe the events like "touched with the 'bad touch'"); *see also United States v. Lohnes*, 554 F.3d 1166, 1169 (8th Cir. 2009) (holding that victim's inability "to verbalize the sexual act d[id] not render her

-8-

testimony insufficient" because she testified that the defendant did "bad stuff to [her]" and "circled words on a diagram").

Further, the jury heard expert testimony explaining that the area S.M. pointed to on the diagram was "the split between the labia majora" and that "[t]he vulva is essentially that labium majora, labium minora . . . [the] whole area that's technically outside of the vagina." R. Doc. 86, at 105. Accordingly, a jury could infer from this description of the vulva that Morrison's penis could have penetrated, even slightly, the "outside of the vagina," *id.*, when his "middle part [would] go," R. Doc. 60-33, at 36:15–16, to her labia majora.

The jury's conclusion that penetration of the vulva occurred was further supported by the circumstantial evidence that, prior to the January incident, S.M. had been suffering from an advanced stage of syphilis—the same sexually transmitted disease that Morrison had sought treatment for months earlier. Morrison argues that the syphilis evidence was insufficient to support his conviction because the transmission of syphilis could have occurred via anal penetration instead of vaginal penetration. However, "[t]he question in a sufficiency-of-the-evidence challenge is not whether a reasonable jury could possibly conceive of an alternative interpretation of the evidence at trial." *United States v. White Bull*, 646 F.3d 1082, 1089 (8th Cir. 2011). Rather, "we ask whether *any* reasonable jury *could have* concluded" that this evidence supports the conclusion that Morrison penetrated S.M.'s vulva. *Id.*

Here, the jury heard medical testimony that syphilis is a blood-borne pathogen that can be "transmitted through semen" and is not contracted "casually." R. Doc. 86, at 30. Rather, it is often transmitted through anal, vaginal, or oral intercourse. Intercourse is a form of sexual contact that necessarily involves penetration. We acknowledge that the circumstantial evidence of a sexually transmitted disease, standing alone, may not be sufficiently direct evidence to convict Morrison of penetrating S.M.'s vulva. Nonetheless, here, it is circumstantial evidence that demonstrates a preexisting pattern of sexual abuse that necessarily involved

intercourse. *See United States v. Jones,* 440 F.3d 927, 928 (8th Cir. 2006) ("Penetration can be proved by circumstantial evidence, and when there is some proof, it is a question of fact whether it occurred." (internal quotation marks omitted)). Therefore, a jury could rely on this evidence, in conjunction with the forensic interview, to reasonably infer that Morrison had penetrated S.M.'s vulva, even slightly, when his "middle part [would] go" to S.M.'s vaginal labia area on those other nights. R. Doc. 60-33, at 36:13–16.

Therefore, considering S.M.'s unambiguous identification of the vaginal labia area as the place where Morrison's middle part would go, the medical testimony that the vulva is defined as the exterior of the vagina, and S.M.'s diagnosis with an advanced stage of the same sexually transmitted disease as Morrison, we cannot say that "no reasonable jury could have found [Morrison] guilty beyond a reasonable doubt" of penetrating S.M.'s vulva with his penis. *King*, 898 F.3d at 808. We have said that a "[s]ufficiency review essentially addresses whether the government's case was so lacking that it should not have even been submitted to the jury. That limited review does not intrude on the jury's role to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. McKee*, 42 F.4th 910, 913 (8th Cir. 2022) (quoting *United States v. Bull*, 8 F.4th 762, 770 (8th Cir. 2021)). Therefore, we conclude that the jury had sufficient evidence to reasonably conclude that Morrison was guilty beyond a reasonable doubt of aggravated sexual abuse as defined in Count I.

## 2. *Count II*

Morrison also challenges the sufficiency of the evidence to support his conviction for Count II. He argues that the absence of testimony from S.M. about Morrison's penis penetrating her anus, and her statement that Morrison did "something to [her] butt" was insufficient to demonstrate penetration. R. Doc. 87, at 43. At trial, S.M. used anatomically correct drawings to identify "what part of [Morrison]" was "use[d] to touch [her] on [her] butt." *Id.* at 44. When asked how that felt, S.M. confirmed that she had told Tonkel that it was "weird" and "disgusting." *Id.* at 45.

Morrison's challenge fails. S.M.'s testimony was not the only account the jury heard describing the abuse. Both of S.M.'s brothers, T.M. and K.M., also testified about what they witnessed the night of the alleged incident. T.M. testified that he saw Morrison "[r]aping S.M." R. Doc. 85, at 109. He explained that he saw Morrison's penis because his pants were off and he was lying down on his side under a blanket. T.M. testified that he saw the blanket "[m]oving side to side" and saw Morrison's hands "[o]n her waist." *Id.* at 111–12. K.M. corroborated this account by testifying that he saw Morrison and S.M. under a blanket, that the blanket was moving, and that Morrison's pants were off. The government asked K.M. whether he "remember[ed] how it was that [Morrison was] able to get his middle part into her B?" R. Doc. 87, at 10. K.M. responded, "He pulled down her pants." *Id.* The neighbor also testified that T.M. told her that Morrison was "doing gay things" to S.M. and that S.M. told her that "sometimes [she] poop[s] blood." R. Doc. 85, at 97.

Based on this evidence, we conclude that a reasonable jury could conclude that Morrison penetrated S.M.'s anus with his penis. Therefore, taking the children's and the neighbor's testimony in the light most favorable to the verdict, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence to support the jury's verdict, there is sufficient evidence to support Morrison's conviction for Count II.

## C. *The Sentence*
### 1. *Substantive Reasonableness*

Morrison challenges the substantive reasonableness of his 480-month sentence, arguing that the district court gave improper weight to Morrison's decision to proceed to trial.

This court reviews for an abuse of discretion the substantive reasonableness of a sentence. *United States v. Armond*, 135 F.4th 626, 628 (8th Cir. 2025) (citing *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc)). "A district court abuses its discretion when it fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant

-11-

factor, or considers only the appropriate factors but in weighing those factors commits a clear error of judgment." *Id.* (internal quotation marks omitted).

Here, Morrison's 480-month sentence was a downward variance from a life sentence. The district court ultimately varied downward because it believed that this conduct did not "happen over a multi-year period." R. Doc. 80, at 18. The district court amply discussed the 18 U.S.C. § 3553(a) factors and noted the aggravating factors, including the following: the victim's age, the victim's relationship to the defendant, the repeated instances of abuse, the transfer of syphilis, the severity of the victim's syphilis condition, and the defendant's lack of acceptance.[1] The court's discussion reflects a sentence that "rest[s] on precisely the kind of defendant-specific determinations that are within the special competence of sentencing courts." *Feemster*, 572 F.3d at 464 (internal quotation marks omitted). Accordingly, the district court did not abuse its discretion in sentencing Morrison to 480 months' imprisonment.

## 2. *Terms of Supervised Release*

Lastly, Morrison argues that the district court's oral pronouncement setting the length of his supervised release contradicts the written judgment. Here, the

---

[1]Here, when discussing Morrison's acceptance of responsibility, the district court reasoned that Morrison had failed to accept responsibility "[a]nd instead, had [his] daughter and [his] two sons . . . testify." R. Doc. 81, at 17. The court noted that "[h]aving them testify doubles the trauma that they've already experienced. *Id.* at 18. Morrison contends that this was an improper factor to consider because it constituted punishment for exercising his right to a jury trial. *See United States v. Sales*, 725 F.2d 458, 460 (8th Cir. 1984) ("A court may not use the sentencing process to punish a defendant, notwithstanding his guilt, for exercising his right to receive a full and fair trial."), *but see United States v. Cruz-Zuniga*, 571 F.3d 721, 727 (8th Cir. 2009) ("It is generally permissible to grant leniency to defendants who plead guilty, and to withhold leniency from defendants who go to trial.").We need not decide whether the court's discussion here constituted punishment of the defendant for exercising his right to a jury trial because the record is clear that the district court did not give significant weight to this factor and ultimately varied downward.

written judgment expands the term of supervised release for Count III from three to five years. The parties do not dispute this conflict in the record. "[A] district court's oral sentence controls when it conflicts with the written judgment." *United States v. Olson*, 716 F.3d 1052, 1056 (8th Cir. 2013). "When such conflicts exist, the portion of the written judgment that is broader than the oral version is void." *United States v. Mays*, 993 F.3d 607, 622 (8th Cir. 2021) (internal quotation marks omitted). The "appropriate remedy" is to remand to the district court with instructions to "reconcile the written judgment with the oral pronouncement by striking the disputed portion." *Id.* (internal quotation marks omitted).

## III. *Conclusion*

For the foregoing reasons, we affirm the district court's admission of the forensic interview evidence; we affirm the judgment of conviction; we affirm the sentence of imprisonment it imposed; we vacate the terms of supervised release; and we remand it to the district court for it to amend its written judgment to conform to its oral pronouncement regarding supervised release.

_____